# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 12, 2007        Decided November 27, 2007

No. 06-1244

FABI CONSTRUCTION COMPANY, INC. AND
PRO MANAGEMENT GROUP,
PETITIONERS

v.

SECRETARY OF LABOR,
RESPONDENT

On Petition for Review of an Order of the
Occupational Safety and Health Administration

*Joseph P. Paranac, Jr.* argued the cause and filed the briefs for petitioners.

*John Shortall*, Attorney, U.S. Department of Labor, argued the cause for respondent. With him on the brief were *Joseph M. Woodward*, Associate Solicitor, and *Nathaniel I. Spiller*, Senior Counselor. *Michael P. Doyle*, Attorney, entered an appearance.

*Steven D. Gordon* argued the cause for *amici curiae* Building Contractors Association of New Jersey, et al. in support of petitioners. With him on the brief were *Michael A. Branca* and *Stephen C. Yohay*.

Before: GINSBURG, *Chief Judge*, and SENTELLE and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

SENTELLE, *Circuit Judge*: Petitioners, Fabi Construction, Inc. and Pro Management Group, seek review of the Occupational Safety and Health Review Commission's (Commission's) affirmance of several citations for violations of the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651–678, (OSH Act) and regulations promulgated under it. We deny review of the Commission's affirmance of violations of the General Duty Clause, 29 U.S.C. § 654(a)(1), and 29 C.F.R. § 1926.703(e)(1), and its treatment of Petitioners as a single entity for OSH Act purposes, as these decisions are reasonable and supported by substantial evidence. Because the Secretary of Labor's (Secretary's) interpretation of "formwork" is unreasonable and failed to provide fair notice to Petitioners, we grant the petition for review of the 29 C.F.R. § 1926.703(a)(1) violation. Accordingly, we vacate the respective citation and fine. Finally, we grant the petition for review of the $7,000 fine assessed for Petitioners' violation of § 1926.703(e)(1). We remand this fine to the Commission for lack of findings sufficient to support raising the $2,500 fine proposed by the Secretary.

## I. Background

Keating Building Corporation, the general contractor for an expansion of the Tropicana Hotel and Casino in Atlantic City, New Jersey, hired Fabi Construction, Inc., and its management company, Pro Management Group, to place concrete for its Tropicana project. Fabi and Pro Management provided labor, materials, and equipment for completing the concrete work. These materials included pre-cast concrete tubs, or "Filigree

slabs," which Fabi placed on site, reinforced with steel (both top steel and reinforcing longitudinal steel, or "rebar"), and filled with additional concrete to create the floors of the structure. Petitioners hired Forrest Consultants and Mid-State Filigree Systems to convert the engineer's structural drawings into "shop drawings," plans Petitioners used on-site that detailed the placement of building components such as top steel and rebar. Inspectors from Site-Blauvelt, a private company, and Atlantic City, checked the steel placement's conformity with the shop drawings before Fabi poured concrete. Because wet concrete is substantially heavier than dry concrete, it requires additional support, or " shores," while drying, or "curing." Fabi provided and constructed formwork to support the curing concrete.

On October 30, 2003, while Petitioners were pouring concrete on the eighth level of what was intended to be a ten-story parking garage, levels four through eight collapsed, killing four of Fabi's employees and injuring twenty-one others. OSHA investigated the accident and cited Fabi and Pro Management for five serious violations and one willful violation of the OSH Act. Willful violations can carry a penalty of up to $70,000, while serious violations are limited to penalties of up to $7,000. 29 U.S.C. §§ 666(a) & (b).

Fabi and Pro Management contested the citations before the Commission. In accordance with 29 U.S.C. § 661(j), the Commission appointed an Administrative Law Judge (ALJ) to hear the case. Just before the hearing, the Secretary withdrew two of the citations for serious violations. After a twelve-day hearing, the ALJ issued a Decision and Order on March 2, 2006, vacating one serious violation, one instance of a serious violation, and the "willful" classification for another violation, and affirming all other citations. In doing so, the ALJ raised the fine for one of the serious violations from $2,500 to $7,000. In addition, the ALJ held that Fabi and Pro Management are a

"single entity" for OSH Act purposes. Fabi and Pro Management filed a petition for discretionary review with the Commission on April 20, 2006. The Commission declined to review the case, so the ALJ's Decision and Order became the Commission's final order on May 1, 2006. *See id.* § 661(j).

Fabi and Pro Management petition this Court for review of all the Commission's adverse findings. First, Petitioners challenge the Commission's finding that they violated the OSH Act's General Duty Clause, 29 U.S.C. § 654(a)(1), by failing to place top steel in accordance with shop drawings and rebar in accordance with industry practice. They allege that these findings are unsupported by substantial evidence. Second, they challenge the Commission's finding that Petitioners violated 29 C.F.R. § 1926.703(a)(1) by failing to maintain formwork so that it would be capable of supporting the imposed loads without failure. They claim that the Secretary's interpretation of "formwork" to include permanent parts of the structure is unreasonable, failed to provide fair notice as required by the Fifth Amendment's Due Process Clause, and was unsupported by substantial evidence. Third, they challenge the Commission's finding that they violated 29 C.F.R. § 1926.703(e)(1) by removing formwork without properly testing the structure's strength. Fabi and Pro Management allege that the Secretary's interpretation of "removal" of formwork to include the step when contractors engage in "cracking," or lowering supporting steel several inches to allow the structure to dry in its natural position, is unreasonable. They also allege that the Commission's assessment of a $7,000 fine when the Secretary only proposed $2,500 was arbitrary and capricious. Finally, Petitioners challenge the Commission's finding that they can be treated as a single entity for OSH Act purposes.

## II. Analysis

We affirm the Commission's decisions unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also AJP Constr., Inc. v. Sec'y of Labor*, 357 F.3d 70, 72–73 (D.C. Cir. 2004). In addition, we give "substantial deference" to an agency's interpretation of its regulations, only setting it aside if the plain language of the regulation or "other indications of the [agency's] intent" require another interpretation. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *see Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 377 (1998); *see also S.G. Loewendick & Sons, Inc. v. Reich*, 70 F.3d 1291, 1294 (D.C. Cir. 1995) (deferring to the Secretary's interpretations of the OSH Act and regulations, not the Commission's, because the Secretary is the policymaker for OSHA). Deference to the Secretary's interpretation of her regulations may even hold when that interpretation first appears in the course of litigation. *Auer v. Robbins*, 519 U.S. 452, 462 (1997).

The OSH Act requires that "findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole" be conclusive. 29 U.S.C. § 660(a); *see also Fabi Constr. Co., Inc. v. Sec'y of Labor* (*Fabi I*), 370 F.3d 29, 33 (D.C. Cir. 2004). Under the "substantial evidence" standard, this Court must uphold the Commission's findings of fact as long as there is enough evidence in the record for a reasonable mind to agree with the Commission. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951); *AJP Constr.*, 357 F.3d at 73. In addition, we " 'must accept the ALJ's credibility determinations . . . unless they are patently unsupportable.' " *Fabi I*, 370 F.3d at 39 (quoting *AJP Constr.*, 357 F.3d at 73).

*A.  General Duty Clause Violation, 29 U.S.C. § 654(a)(1)*

We begin with the Commission's findings that Fabi and Pro Management violated the OSH Act's General Duty Clause in two ways:  first, that Petitioners failed to place top steel in accordance with shop drawings, and second, that they failed to place rebar in accordance with industry practice.  Petitioners allege that the Commission's findings are unreasonable and unsupported by substantial evidence.  For the reasons set forth below, we disagree.

The General Duty Clause requires an employer to provide a working environment "free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." 29 U.S.C. § 654(a)(1).  To establish a violation of the General Duty Clause, the Secretary must establish that: (1) an activity or condition in the employer's workplace presented a hazard to an employee, (2) either the employer or the industry recognized the condition or activity as a hazard, (3) the hazard was likely to or actually caused death or serious physical harm, and (4) a feasible means to eliminate or materially reduce the hazard existed.  *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Gen. Dynamics Land Sys. Div.*, 815 F.2d 1570, 1577 (D.C. Cir. 1987).  In other words, "the *Secretary* must prove that a reasonably prudent employer familiar with the circumstances of the industry would have protected against the hazard in the manner specified by the Secretary's citation."  *L.R. Willson & Sons, Inc. v. Occupational Safety & Health Rev. Comm'n*, 698 F.2d 507, 513 (D.C. Cir. 1983).

### 1.  Top Steel

Petitioners first contend that their placement of top steel conformed to the requirements of the General Duty Clause.

Specifically, they assert that the Secretary failed to show by substantial evidence that they violated the fourth element of the General Duty Clause for two reasons: first, they abated the hazard by following Mid-State Filigree Systems's shop drawings for placing top steel, and second, the abatement method the Secretary proposed—following Forrest Consultants's shop drawings—was infeasible. Petitioners claim that by abutting the top steel to the crash wall and inserting the top steel into the columns an average of four inches, they abated the hazard. They claim that this placement satisfied their duties under this clause because they followed the shop drawings that Mid-State prepared for the placement of top steel. Mid-State's drawings did not show the top steel-to-column connections at all and showed the top steel stopping before the crash wall without attaching to the wall in any way. But based on testimony from one of the Secretary's experts and the face of the shop drawings themselves, the ALJ found that Forrest Consultants prepared the shop drawings that were meant to be used for top steel placement, not Mid-State. In making her finding, the ALJ cited a Mid-State shop drawing as persuasive evidence that it was not meant for the purpose Petitioners assert. Mid-State's drawing contains blown-up depictions of cross-sections of slabs and some of the reinforcing steel to be placed within them. But instead of detailing the placement of top steel within the slab, the drawing points to the top part of the slab and writes, "TOP STEEL AS REQ'D (BY OTHERS)." The ALJ found that the "others" indicated in Mid-State's drawing were Forrest Consultants. As support, the ALJ cited a shop drawing that Forrest Consultants prepared and titled:

PARKING LEVELS 5 THROUGH 9
SLAB
TOP STEEL

One of the Secretary's experts testified that Forrest Consultants's drawing required Petitioners to attach the top steel to the crash wall and to embed the top steel into the columns about eight inches. Petitioners discount this expert's credibility because he had trouble determining the precise embedment depth in a structural drawing made on the same scale. But "'[w]e must accept the ALJ's credibility determinations . . . unless they are patently unsupportable.'" *AJP Constr.*, 357 F.3d at 73 (quoting *Tasty Baking Co. v. NLRB*, 254 F.3d 114, 124 (D.C. Cir. 2001)). Forrest Consultants's drawing, though on a small scale, indicates the placement of the top steel in a pronounced way, using large, criss-crossed lines. The ALJ saw this drawing and took it into account when she assessed the witness's credibility. In addition, the ALJ relied not only on this expert's opinion, but her own assessment of the shop drawings in the record to make the determination that Forrest Consultants's shop drawings were intended to be used for the placement of top steel. This evidence is not insubstantial.

Petitioners also claim that the Secretary failed to put forth substantial evidence of a *feasible* method to abate the top steel hazard. *Int'l Union*, 815 F.2d at 1577. It is undisputed that if Fabi and Pro Management had followed Forrest Consultants's shop drawings for the placement of top steel, the crash wall that ran along the parking garage's exterior would have blocked the proper embedment. But Petitioners mischaracterize the Secretary's proposed method of abatement. The Secretary does not contend that Petitioners should follow the shop drawings when they are physically impossible to carry out. She only contends that Petitioners should follow the correct shop drawings, and when questions arise, follow industry practice by contacting the structural engineer about discrepancies. There is ample evidence in the record to support the finding that contacting the structural engineer is a feasible method of abatement. In fact, Fabi and Pro Management did just that when

a discrepancy arose in a shop drawing earlier in the construction project. There is no support to Petitioners' contention that the Secretary failed to put forth a feasible method of abating the top steel hazard.

Last, Petitioners contend that they were entitled to rely upon the expertise of specialists who completed the shop drawings and approved the placement of top steel before Fabi poured concrete into the pre-cast filigree tubs. For this proposition, they cite *Secretary of Labor v. Sasser Electric & Manufacturing Co.*, 11 O.S.H. Cas. (BNA) 2133 (Rev. Comm'n 1984), a Commission decision which established that reasonable reliance upon a specialist to prevent hazards outside the contractor's area of knowledge and over which the contractor has little to no control, can negate the knowledge required for a General Duty Clause violation. *Id.* at 2136. As the ALJ properly found, *Sasser* does not control this situation. In *Sasser*, a contractor that had no experience operating cranes hired a crane operator to move a generator onto a trailer. *Id.* The operator, who had sole control over the operation of the crane, successfully loaded the generator onto a trailer, and then suddenly swung the crane into some power lines. *Id.* The entire operation took several minutes at most. The Commission found that the contractor reasonably relied upon the expertise of this specialist to complete his work without creating a hazard. *Id.*

*Sasser* does not relieve Petitioners of liability. First, the facts in *Sasser* are wholly unlike those of this case. Unlike the contractor in *Sasser*, Petitioners are experienced concrete contractors that share expertise in the interpretation of shop drawings. Also, unlike *Sasser*, the subcontractors who created the shop drawings did not have sole control over them; the President of both Fabi and Pro Management testified that he reviewed the shop drawings, and in one instance, even directed a revision in them. Nor did the inspectors who approved the

placement of reinforcing steel have sole control over it; Petitioners interpreted the shop drawings and physically placed the steel themselves. Even if Petitioners' level of control was not apparent, *Sasser* itself contemplates imposing liability "when the cited hazard is under the control of a separate company, [because] the employer has a duty to protect its employees who are exposed to the hazards." *Id.* Here, the hazard is not under the sole control of another company; instead, Petitioners share control over it. Sharing control is not relinquishing control. Finally, the hazard in this case took place over the span of several weeks at the direction of Petitioners' management team and by the hands of Petitioners' employees. Petitioners had weeks to recognize and abate the hazard, unlike the few minutes in *Sasser*. In short, *Sasser* requires *reasonable* reliance on contractors. Therefore, it does not apply when an employer has reason, by way of expertise, control, and time, to foresee a danger to its employees. The ALJ had considerably more evidence than is required by our deferential standard of review to support her finding that Petitioners could not reasonably rely on specialists to relieve themselves of liability in this situation.

### 2. Rebar

Petitioners next contend that their placement of rebar conformed to the requirements of the General Duty Clause. Specifically, they allege that the ALJ's finding that they "knew or should have known" that the placement of rebar violated industry practice was unsupported by substantial evidence and unreasonable. It is undisputed that the approved shop drawings did not show rebar passing through the columns along one of the exterior walls in the structure. Fabi and Pro Management argue that they fulfilled their duty by placing rebar in accordance with these drawings. But the Secretary contends that Petitioners' duty extends beyond blindly following the shop drawings when

the contractor actually or constructively knows that the drawings violate industry custom.

There is enough evidence in the record, considered as a whole, for a reasonable mind to conclude that Petitioners knew their placement of rebar violated industry practice. The record includes testimony that Petitioners at least had constructive knowledge that failing to run rebar into columns violated industry practice. One of the Secretary's experts testified upon cross-examination that a contractor like Fabi would know the shop drawings erroneously failed to show rebar running through the building's columns because "it's just typical that there's some bar reinforcing that goes into the support." The ALJ found this expert to be credible and qualified to render an expert opinion on industry practice. Additionally, there is some evidence in the record that Pro Management had actual knowledge of this industry practice. Pro Management's Superintendent on the worksite testified that he was familiar with the American Concrete Institute codes relevant to the work he supervised, codes which require rebar to pass through concrete columns. Finally, the ALJ found that Fabi is an experienced concrete contractor, and as such, sufficiently experienced to know that the shop drawings called for rebar placement that violated industry custom and practice.

However, we cannot stop our analysis of the evidence relating to Petitioners' knowledge of industry practice here. It is the responsibility of the reviewing court to "take account of anything in the record that 'fairly detracts' from the weight of the evidence supporting the [Commission's] conclusion." *General Elec. Co. v. NLRB*, 117 F.3d 627, 630 (D.C. Cir. 1997) (citing *Universal Camera*, 340 U.S. at 488). In addition to the evidence compiled above, the record contains a post-accident report by OSHA that states the "structural engineer was in a unique position to address the integrity of the slab beam

connection to the column since he had access to all the information, including the intent of his design."  The report's phrasing suggests that no other person can be expected to double-check the engineer's judgment in this area.  But overwhelming evidence flatly rejects this proposition. Subcontractors create shop drawings from the engineer's plans, and in doing so must detail the size and placement of reinforcing steel in the flooring-column connection.  Contractors like Fabi and Pro Management are also responsible for looking over the shop drawings, and in one instance Petitioners' management even contacted the engineer to change an inaccurate design plan. One of the Secretary's experts testified that when there is a problem with the shop drawings, the superintendent "should contact the structural engineer and say, 'There's a problem here, what can we do to fix it?'"  Under our deferential standard of review, "we must uphold the [Commission's] decision even if we would have reached a different result upon *de novo* review." *Federated Logistics & Operations v. NLRB*, 400 F.3d 920, 923 (D.C. Cir. 2005).  Taking into account the whole record, there is still enough evidence for a reasonable mind to conclude that Fabi and Pro Management either knew or should have known that they violated industry practice when they failed to run rebar through the building's columns.

Four trade associations, all composed of construction contractors of one sort or another, argue that Petitioners are shielded from liability here under the so-called *Spearin* doctrine drawn from *United States v. Spearin*, 248 U.S. 132 (1918).  We disagree.  *Spearin* does not shield Petitioners from liability here. *Spearin* dealt with contractual obligations – not OSH Act obligations to provide a safe worksite.  It "held that 'if [a] contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications.'"  *KiSKA Constr. Corp. v. Wash. Metro. Area*

*Transit Auth.* 321 F.3d 1151, 1162 (D.C. Cir. 2003) (quoting *Spearin*, 248 U.S. at 136). The *KiSKA* court distinguished *Spearin*. In *KiSKA*, a contractor attempted to rely on what it purported to be the "plain meaning" of the contract language, but this Court found that "grammatical errors . . . render the ambiguity of the . . . provisions sufficiently obvious that KiSKA had a duty to inquire as to the true meaning of the contract." *Id.* at 1164. *KiSKA* provides more support for the Secretary's position that obvious inconsistencies in a shop drawing should put the contractor on notice to inquire about them instead of "slavishly following" incorrect drawings. *See Sec'y of Labor v. Fabi Constr., Inc.*, 21 O.S.H. Cas. (BNA) 1595, 1599 (Rev. Comm'n 2006) ("While the contractor may lack the engineering expertise to overrule or ignore the shop drawings, to hold that he must slavishly follow them ignores the fact that the contractor has practical experience in the field and is in a position to know when the shop drawings are contrary to generally accepted practice."). As was the case in *KiSKA*, *Spearin* does not extend to the facts before us. Petitioners knew or should have known that the drawings upon which they relied created a serious hazard for their employees.

Petitioners also argue that the Secretary proposed an arbitrary and infeasible method of abating the rebar hazard. Specifically, they argue that the ALJ's decision about a feasible method of abatement is incoherent. Petitioners cite a portion of the ALJ's Decision and Order which states "the *only* feasible abatement method is to install the reinforcing steel in conformance with the drawings in the first instance." *Fabi Constr.*, 21 O.S.H. Cas. (BNA) at 1599 (emphasis added). The ALJ later states that feasible abatement could have been accomplished by "stopping to consult the structural engineer to ensure that the shop drawings were either properly drawn or interpreted." *Id.* at 1601. While the ALJ's unnecessary use of the word "only" is imprecise, it does not deprive the decision of

reason. The Commission reasonably found upon ample evidence in the record that a feasible method of abatement would have been for Petitioners to contact the structural engineer. Petitioners did not do so; therefore, the Commission reasonably found they failed to abate the hazard.

Last, Petitioners again attempt to rely on *Sasser* to relieve themselves of liability for violating the General Duty Clause by failing to place rebar in accordance with industry practice. For the reasons stated above, their reliance is misplaced.

*B.  Formwork Maintenance Violation, 29 C.F.R. § 1926.703(a)(1)*

Petitioners also challenge the ALJ's finding that they violated 29 C.F.R. § 1926.703(a)(1) by failing to maintain formwork so that it would be capable of supporting the imposed loads without failure. Specifically, they claim that the Secretary's interpretation of "formwork" to include permanent parts of the structure is unreasonable, failed to provide fair notice as required by the Fifth Amendment's Due Process Clause, and was unsupported by substantial evidence. For the reasons set forth below, we believe the Secretary's interpretation of "formwork" to include permanent parts of structures is unreasonable, and further, that announcing this interpretation for the first time in an adjudicatory proceeding deprived Petitioners of fair notice. For these reasons, we grant the petition for review of this violation and vacate both the citation and fine.

Section 1926.703(a)(1) requires formwork to be "designed, fabricated, erected, supported, braced and maintained so that it will be capable of supporting without failure all vertical and lateral loads that may reasonably be anticipated to be applied to the formwork." The Secretary cited Fabi and Pro Management because the slabs, composed of pre-cast concrete filigree tubs,

reinforcing steel, and concrete poured on site, were not capable of supporting anticipated loads without failure. Petitioners claim that the plain language of "formwork" in the context of the regulation cannot include permanent parts of structures like slabs. We agree. Since the Secretary only cited Petitioners for failing to maintain slabs, which are permanent parts of the structure, this violation cannot stand.

We review Commission decisions "for consistency with the Secretary's interpretation and with the language of the regulation, and for reasonableness." *S.G. Loewendick*, 70 F.3d at 1296. The text of the regulation provides some support for the Secretary's interpretation, but when read in the context of the whole regulation, the Secretary's interpretation fails to make sense. The regulation defines formwork as "the total system of support for freshly placed or partially cured concrete, including the mold or sheeting (form) that is in contact with the concrete as well as all supporting members including shores, reshores, hardware, braces, and related hardware." 29 C.F.R. § 1926.700(b)(2). "It is hornbook law that the use of the word 'including' indicates that the specified list . . . that follows is illustrative, not exclusive." *P.R. Mar. Shipping Auth. v. ICC*, 645 F.2d 1102, 1112 n.26 (D.C. Cir. 1981). The enumerated list of supporting members—shores, reshores, and the like—is not exhaustive. Seemingly, from this isolated text, "total system of support" can include any part of the structure that supports curing concrete. The illustrative list does, however, lend weight to Petitioners' argument that formwork only includes temporary parts of structures. All the examples listed in the definition are on site only until the concrete cures.

The background regulatory structure demonstrates that the Secretary's new interpretation of formwork to include parts of the permanent structure is beyond the bounds of reasonableness. 29 C.F.R. § 1926.703(a)(1) specifies that formwork "which is

designed . . . and maintained in conformance with the Appendix to this section will be deemed to meet the requirements of this paragraph." The Appendix to that section provides a "nonmandatory guideline to assist employers in complying with formwork requirements" in the regulations. It expressly approves

> [f]ormwork which has been designed, fabricated, erected, braced, supported, and maintained in accordance with Sections 6 and 7 of the American National Standard for Construction and Demolition Operations–Concrete and Masonry Work . . . .

Within the referenced ANSI sections, Paragraph 7.1.1 provides that:

> Formwork shall be designed, fabricated, erected, supported, braced, and maintained so that it will support all vertical and lateral loads that may be applied *until such loads can be supported by the structure*.

Given this tacit approval and assumption that formwork is designed to hold loads in place pending the support of those loads by the completed structure, the Secretary's attempt to define formwork as including permanent structure cannot be upheld.

Not only does "formwork" appear in the definitions section and the section under which the Petitioners received a citation, but it also appears in § 1926.703(e), which sets forth certain procedures prior to the "removal of formwork." 29 C.F.R. § 1926.703(e). Viewed under the canon of statutory construction known as *noscitur a sociis*, there are some definite limits to the Secretary's interpretation of formwork. *Noscitur a sociis* applies where a word in a regulation is ambiguous, but

other text within the regulation can clarify its meaning. *See Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 400 (D.C. Cir. 2004). Petitioners reason that any part of a structure that cannot be removed, even if it is part of the "total system of support," cannot be considered "formwork." We agree. The plain language of the regulation excludes permanent parts of the structure from the definition of formwork. Although we give "substantial deference" to the Secretary's interpretation of OSHA regulations, we must set it aside if the plain language of the regulation requires another interpretation. *Shalala*, 512 U.S. at 512. As a result, nonremovable parts of the structure, like slabs that make up the floor of the parking garage at issue in this incident, cannot be considered formwork. Therefore, any hazard created by Petitioners' failure to maintain the slabs cannot be the basis for a violation of § 1926.703(a)(1).

The near uniformity in the concrete industry's manuals and codes in defining formwork as temporary parts of structures provides further support for the unreasonableness of the Secretary's interpretation. *See, e.g.*, HUGH BROOKS, ENCYCLOPEDIA OF BUILDING AND CONSTRUCTION TERMS 184 (1983) (defining formwork as "*temporary* wood or metal surfaces used to contain concrete until it hardens, after which they are removed"); JIM FRANE, DICTIONARY OF CONSTRUCTION TERMS 216 (C.M. Harris ed., 1975) (defining formwork as "a *temporary* construction to contain wet concrete in the required shape while it is cast and setting"); W.C. HUNTINGTON, BUILDING CONSTRUCTION 143 (1981) (defining formwork as a "*temporary* structure that can be disassembled in a relatively short period of time, that is economical, and that will support the excessive dead and live loads"); M.K. HURD, FORMWORK FOR CONCRETE 2-1 (6th ed. 1995) (defining formwork as a "*temporary* structure that supports its own weight and that of the freshly placed concrete") (emphasis added to all). Practically, it makes sense that formwork is temporary. Its purpose is to

support freshly poured concrete while it cures. Because wet concrete is heavier than dry concrete, formwork is no longer necessary when concrete is dry.

The issue is complicated somewhat by a relatively new form of concrete construction that Petitioners used on the Tropicana project. This kind of construction uses what Petitioners refer to as "a pre-cast concrete slab and beam that serve as a *permanent* formwork for the cast-in-place concrete poured on site." Petitioners' Br. at xv (emphasis added). One of the Secretary's experts also referred to the pre-cast concrete tubs as "form." Essentially, the pre-cast slabs and beams form a concrete tub into which Petitioners place reinforcing steel and pour concrete. These elements make up the floor of the structure. Although this testimony supports the Secretary's theory that form can be permanent in a colloquial sense, the text of § 1926.703(e) precludes permanent structures from the definition of formwork in the context of the regulation.

Even the ALJ admitted the Secretary's interpretation of formwork is "strained." *Fabi Constr.*, 21 O.S.H. Cas. (BNA) at 1606 ("While the Commission is sympathetic to the employer's objection to the Secretary's strained interpretation of the standard, it cannot be concluded that her interpretation is unreasonable."). "In an adjudicatory proceeding, the Commission should not strain the plain and natural meaning of words . . . ." *Bethlehem Steel Corp. v. Occupational Safety & Health Rev. Comm'n*, 573 F.2d 157, 161 (3d Cir. 1978). There is a clear purpose behind this precedent of refusing to support strained interpretations of agency regulations: To do so "for the purpose of alleviating a perceived safety hazard is to delay the day when the occupational safety and health regulations will be written in clear and concise language so that employers will be better able to understand and observe them." *Diamond Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 528 F.2d

645, 650 (5th Cir. 1976).  We are hopeful that in the more than three intervening decades since the U.S. Court of Appeals for the Fifth Circuit decided *Diamond Roofing*, regulations have in fact become more clear.  We do not wish to disturb the longstanding precedent for declining to "press [the] limits [of] judicial construction" when OSHA can easily amend the regulation "under the flexible regulation promulgating structure" of the OSH Act.  *Id.* at 649; *see* 29 U.S.C. § 655 (detailing the procedures the Secretary may use to promulgate OSHA standards).  If the Secretary wants to expand the definition of formwork to include permanent parts of structures like concrete slabs, she has alternate means to do so outside the adjudicative process.  *See Bethlehem Steel*, 573 F.2d at 161 ("If the language [in the regulation] is faulty, the Secretary has the means and the obligation to amend.").

Even if the Secretary's interpretation were reasonable, announcing it for the first time in the context of this adjudication deprives Petitioners of fair notice.  Where, as here, a party first receives actual notice of a proscribed activity through a citation, it implicates the Due Process Clause of the Fifth Amendment.  *See Martin v. Occupational Safety & Health Rev. Comm'n*, 499 U.S. 144, 158 (1991) (noting that "the decision to use a citation as the initial means for announcing a particular interpretation may bear on the adequacy of notice to regulated parties").  Due process requires the government to provide fair notice before depriving a party of property.  *Jones v. Flowers*, 547 U.S. 220, 226 (2006).

Here, Petitioners received no actual warning from OSHA officials that § 1926.703(a)(1) would include slabs in its definition of "formwork."  *See General Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995) (opining that an agency warning prior to a citation would provide the required notice).  As in *General Electric v. EPA*, we must look to the text of the

regulation itself to determine whether it provides the required notice of the Secretary's interpretation:

> [W]e must ask whether the regulated party received, or should have received, notice of the agency's interpretation in the most obvious way of all: by reading the regulations. If, by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with "ascertainable certainty," the standards with which the agency expects parties to conform, then the agency has fairly notified a petitioner of the agency's interpretation.

*Id.* (citing *Diamond Roofing*, 528 F.2d at 649). As we discussed above, the regulations at issue do not give Petitioners fair notice of the Secretary's interpretation. Prior to Petitioners' citation, the Secretary made no announcement or any other indication of her intention to define formwork in this manner. Furthermore, the overwhelming agreement among industry manuals and codes that formwork is temporary similarly fails to provide notice. For the reasons stated above, after a good-faith review of "the regulations and other public statements issued by the agency, a regulated party acting in good faith" would not be able "to identify, with ascertainable certainty, the standards with which the agency expects parties to conform." *AJP Constr.*, 357 F.3d at 76 (quoting *General Elec.*, 53 F.3d at 1329). For these reasons, we grant the petition for review and vacate both the citation and fine.

### C. Formwork Removal Violation, 29 C.F.R. § 1926.703(e)

Third, Petitioners challenge the ALJ's finding that they violated 29 C.F.R. § 1926.703(e)(1) by removing formwork without properly testing the structure's strength. Fabi and Pro Management allege that the Secretary's interpretation of

"removal" of formwork to include the step when contractors engage in "cracking," or lowering supporting steel several inches to allow the structure to dry in its natural position, is unreasonable. They also allege that the ALJ's assessment of a $7,000 fine when the Secretary only proposed $2,500 was arbitrary and capricious.

First, we assess the reasonableness of the Secretary's interpretation of "removal" in the context of the regulation. Section 1926.703(e)(1) requires forms and shores to "not be removed until the employer determines that the concrete has gained sufficient strength to support its weight and superimposed loads." An employer can comply with this regulation by following "[t]he plans and specifications . . . for removal of forms and shores," or by testing the concrete "with an appropriate ASTM standard test method designed to indicate the concrete compressive strength, and the test results indicate that the concrete has gained sufficient strength to support its weight and superimposed loads." *Id.* There are two ways to fulfill the regulation's requirements: either follow a plan for removing formwork, or use an appropriate method to test the concrete's strength before removing formwork. Petitioners used the second option, but they did so seven days after pouring the concrete. Four to five days after pouring concrete, Petitioners "cracked" the shores that rested against the underside of the curing concrete slabs. "Cracking" is the practice of lowering shores several inches to allow the concrete room to sag a bit to its natural position before retightening the shores against the underside of the concrete. The Secretary argued, and the ALJ agreed, that "cracking" is equivalent to removing shores, for the simple reason that "the slab does not know that the shores have been cracked 2 inches or it has been removed." *Fabi. Constr.*, 21 O.S.H. Cas. (BNA) at 1604.

"The removal of forms and shores," 29 C.F.R. § 1926.703(e)(1), can be interpreted to mean only the *final* removal of shores, or to include the initial cracking of shores that takes place weeks before shores are finally removed. Since the definition of "removal" in the regulation is ambiguous, we must give substantial deference to the Secretary's interpretation, and will only set it aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Allentown*, 522 U.S. at 377. Petitioners' and the Secretary's experts testified to the fact that after workmen crack the shores, the shores no longer support the underside of the drying concrete slab. Since the purpose of shoring is to support curing concrete, it is "removed" when cracked. The Secretary's interpretation is reasonable, especially in light of the stated purpose of the OSH Act—"to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources." 29 U.S.C. § 651(b). For this reason, we deny review of this citation.

We do, however, grant review of the fine assessed for Petitioners' § 1926.703(e)(1) violation. We review this fine under our familiar arbitrary and capricious standard. The Secretary proposed a $2,500 fine for this citation. The ALJ "assessed [the fine] as proposed" by the Secretary, and without further explanation, raised the fine to $7,000. *Fabi. Constr.*, 21 O.S.H. Cas. (BNA) at 1608. There must be an "adequate factual basis" for almost tripling the penalty proposed by the Secretary. *See Sec'y of Labor v. J.A. Jones Constr. Co.*, 15 O.S.H. Cas. (BNA) 2201, 2202 (Rev. Comm'n 1993). The ALJ apparently did not recognize she was deviating from the Secretary's proposed fine of $2,500; in any event, she did not explain her reason for imposing a fine of $7,000. Therefore, we remand the fine to the Commission to explain why it deviated from the $2,500 fine proposed by the Secretary.

*D.  Single-Entity Rule*

Finally, Petitioners challenge the ALJ's finding that they can be treated as a single entity for OSH Act purposes.  The Commission treats companies as a single entity when (1) they share a common worksite, (2) have interrelated and integrated operations, and (3) share a common president, management, supervision, or ownership.  *Sec'y of Labor v. C.T. Taylor Co. & Espirit Constructors, Inc.*, 20 O.S.H. Cas. (BNA) 1083, 1086 (Rev. Comm'n 2003).  This rule allows the Secretary to use any violations against companies treated as a single entity against them in either their individual or combined-entity capacities in later proceedings.  *Id.* at 1087 n.7.

We decline to address this argument because Petitioners failed to raise it before the Commission.  "No objection that has not been urged before the Commission shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."  29 U.S.C. § 660(a).  Petitioners did not object to being treated as a single entity before the Commission; therefore, they have waived their argument that the two companies should be treated separately for OSHA purposes.   For this reason, we deny this petition for review.

Even if Petitioners had not waived this argument, there is substantial evidence that Fabi Construction and Pro Management can be treated as a single entity for OSHA purposes.  The Secretary elicited testimony from the President of both entities that he is the sole owner, officer, and shareholder of both companies.  The companies share a common main office and office workers, and employees of Pro Management supervise Fabi Construction employees at the worksite.  Pro Management's Superintendent on the worksite even identified himself as an employee of Fabi Construction to an OSHA

official. The three prongs of the "single-entity test" are met: the companies "share a common worksite, have interrelated and integrated operations, and share a common president, management, supervision, or ownership." *Sec'y of Labor v. Trinity Indus., Inc.*, 9 O.S.H. Cas. (BNA) 1515, 1518 (Rev. Comm'n 1981).

### III.  Conclusion

For the reasons set forth above, the petition for review is

*Granted in part and denied in part.*