KAVANAUGH, Circuit Judge,
dissenting:
Many sports events and entertainment shows can be extremely dangerous for the participants. Football. Ice hockey. Downhill skiing. Air shows. The circus. Horse racing. Tiger taming. Standing in the batter’s box against a 95 mile per hour fastball. Bull riding at the rodeo. Skydiving into the stadium before a football game. Daredevil motorcycle jumps. Stock car racing. Cheerleading vaults. Boxing. The balance beam. The ironman triathlon. Animal trainer shows. Movie stunts. The list goes on.
But the participants in those activities want to take part, sometimes even to make a career of it, despite and occasionally because of the known risk of serious inju *1217 ry. To be fearless, courageous, tough — to perform a sport or activity at the highest levels of human capacity, even in the face of known physical risk — is among the greatest forms of personal achievement for many who take part in these activities. American spectators enjoy watching these amazing feats of competition and daring, and they pay a lot to do so. Americans like to witness the thrill of victory, to cheer the linebacker who hammers the running back at the goal line, to yell with admiration as Derek Jeter flies into the stands down the left-field line to make a catch, to applaud the gymnast who nails the back flip off the balance beam, to hold their collective breath as Jack Hanna plays with pythons, to root on the marathoner who is near collapse at the finish line, to scream “Foreman” when the announcer says “Down goes Frazier.” And American spectators also commiserate during the “agony of defeat,” as immortalized in the Wide World of Sports video of a ski jumper flying horribly off course.
The broad question implicated by this case is this: When should we as a society paternalistieally decide that the participants in these sports and entertainment activities must be protected from themselves — that the risk of significant physical injury is simply too great even for eager and willing participants? And most importantly for this case, who decides that the risk to participants is too high?
In the first instance, the sports and entertainment industries regulate themselves, often through collaboration between management and participants, to ensure that the risks are at least known to all. Often, the sports and entertainment industries take affirmative steps to make the sports or activities safer for participants. Major League Baseball has required batters to wear increasingly protective helmets; just this offseason, it issued a new rule about home-plate collisions. The NFL has prohibited certain hits to the head. NASCAR has mandated roll cages, fire retardant uniforms, and window netting. And so on.
Sometimes Congress, state legislatures, or state regulators jump into the fray by prohibiting or otherwise regulating certain sports or entertainment activities. See, e.g., Professional Boxing Safety Act of 1996, Pub.L. No. 104-272, 110 Stat. 3309. State tort law also looms as a significant constraint in most jurisdictions, particularly for allegedly known but unwarned-of risks to the participants, as the NFL has recently experienced. See In re National Football League Players’ Concussion Injury Litigation, 961 F.Supp.2d 708 (E.D.Pa.2014).
On the other hand, the bureaucracy at the U.S. Department of Labor has not traditionally been thought of as the proper body to decide whether to ban fighting in hockey, to prohibit the punt return in football, to regulate the distance between the mound and home plate in baseball, to separate the lions from the tamers at the circus, or the like.
To be sure, the Occupational Safety and Health Act of 1970 grants general authority to the Department of Labor to ensure that employers provide a reasonably safe workplace to their employees. See Pub.L. No. 91-596, 84 Stat. 1590. Under the Act, the Department may promulgate specific occupational safety and health standards “reasonably necessary or appropriate to provide safe or healthful employment and places of employment.” 29 U.S.C. § 652(8); see id. § 655(b). The Act’s residual General Duty Clause also requires that each employer — under threat of monetary penalties in individual cases — “furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing *1218 or. are likely to cause death or serious physical harm to his employees.” Id. § 654(a)(1); see id. § 666.
But the Department of Labor, acting with a fair degree of prudence and wisdom, has not traditionally tried to stretch its general authority under the Act to regulate participants taking part in the normal activities of sports events or entertainment shows.
In this case, however, the Department departed from tradition and stormed headlong into a new regulatory arena. The Department issued a citation to SeaWorld that effectively bans SeaWorld from continuing a longstanding and popular (albeit by definition somewhat dangerous) show in which SeaWorld trainers play with and interact with whales. The Department’s SeaWorld decision was upheld administratively by the independent Occupational Safety and Health Review Commission,[1] and the majority opinion today affirms.
Whether SeaWorld’s show is unreasonably dangerous to participants and should be banned or changed is not the question before us. The question before us is whether the Department of Labor has authority under current law to make that decision — in addition to the authority already possessed by Congress, state legislatures, state regulators, and courts applying state tort law.
in my view, the Department of Labor’s unprecedented assertion of authority to proscribe SeaWorld’s whale show is triply flawed: First, it departs from longstanding administrative precedent governing the extent of the Department’s authority. Second, it irrationally and arbitrarily distinguishes (i) close contact between trainers and whales in SeaWorld shows from (ii) contact between players in the NFL or speeding in NASCAR races, for example, which the Department still proclaims as exempt from regulation under this statute. Third, the decision green-lights the Department to regulate sports and entertainment activities in a way that Congress could not conceivably have intended in 1970 when giving the agency general authority to ensure safer workplaces.[2]
First, the Department of Labor’s action departs without acknowledgment or explanation from longstanding administrative precedent. It is therefore arbitrary and capricious and cannot stand. See FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009) (“An agency may not, for example, depart from a prior policy sub silentio or simply disregard rules that are still on the books.”).
The courts and the Department of Labor have recognized that the broad terms *1219 of the General Duty Clause must be applied reasonably lest the Clause morph into a blunt instrument by which absolute workers’-compensation-like liability is imposed on employers for all workplace injuries. The courts and the Department have stated that it must have been “feasible” for the employer to eliminate or materially reduce the recognized hazard at issue. See, e.g., Fabi Construction Co., Inc. v. Secretary of Labor, 508 F.3d 1077, 1081 (D.C.Cir.2007); National Realty & Construction Co., Inc. v. Occupational Safety & Health Review Commission, 489 F.2d 1257, 1266-67 & n. 37 (D.C.Cir.1973). And importantly, the Department has acknowledged that hazards posed by the normal activities intrinsic to an industry cannot be “feasibly” eliminated and so may not form the basis of a General Duty Clause citation.
In the leading Pelron case, the Department of Labor had issued a General Duty Clause citation to Pelron Corporation, a manufacturer of liquid specialty chemicals, following a chemical explosion at one of Pelron’s manufacturing facilities. See Pelron Corp., 12 BNA OSHC 1833, 1986 WL 53616, at *1 (No. 82-388, 1986). The Department alleged that the mere “accumulation” in Pelron’s facility of a potentially dangerous chemical constituted a recognized hazard that Pelron had failed to eliminate. Id. at *4. But the Occupational Safety and Health Review Commission vacated the Department’s citation. See id. at *1. In explaining why the mere presence of a dangerous chemical could not constitute a recognized hazard, the Commission stated: “Obviously, some industrial activities are by their very nature dangerous. To permit the normal activities in such an industry to be defined as a ‘recognized hazard’ within the meaning” of the General Duty Clause is “to eliminate an element of the Secretary’s burden of proof and, in fact, almost to prove the Secretary’s case by definition, since under such a formula the employer can never free the workplace of inherent risks incident to the business.” Id. at *3.
Pelron means that some activities, though dangerous, are among the “normal activities” intrinsic to the industry and therefore cannot be proscribed or penalized under the General Duty Clause. At oral argument, counsel for the Department of Labor confirmed that Pelron remains good law, and so the Department must adhere to Pelron. See Oral Arg. at 17:02-17:05.
Pelron is dispositive in this case. In the sports and entertainment fields, the activity itself frequently carries some risk that cannot be eliminated without fundamentally altering the nature of the activity as defined within the industry. Tackling is part of football, speeding is part of stock car racing, playing with dangerous animals is part of zoo and animal shows, and punching is part of boxing, as those industries define themselves.
Management and participants in the relevant sports or entertainment industry must initially decide what their competition or show consists of and how to market it to spectators — subject to appropriate regulation by Congress, state legislatures, state regulators, or state tort law. Here, SeaWorld has decided that close contact between SeaWorld trainers and whales is an important aspect of its shows. Even the administrative law judge who upheld the Department’s citation in this case agreed that “SeaWorld’s business model was premised on the spectacle of close contact between the killer whales and the trainers during performances.” SeaWorld of Florida, LLC, 2013 CCH OSHD ¶ 33,-329, 2013 WL 5505276, at *5 (No. 12-1697, 2013) (ALJ).
*1220 Under the current statutory scheme, Pelron precludes the Department of Labor from entering the arena and altering the activities of the participants in those competitions or shows, whether it be the NFL or NASCAR or SeaWorld. The Department of Labor can no more tell the participants in a sports event or entertainment show that their activities are simply too dangerous to perform than it could tell the Pelron Corporation that its chemicals were simply too dangerous to produce.
In short, under Pelron, the Department of Labor lacks authority to regulate the normal activities of participants in sports events or entertainment shows. Indeed, until its action against SeaWorld, the Department of Labor had never before asserted authority to regulate the normal activities of participants in sports events or entertainment shows.[3] If Pelron remains good law — and the Department itself acknowledges that it does — then the Department’s unprecedented attempt here to ban close contact between trainers and whales at SeaWorld cannot stand.[4]
Second, a “fundamental norm of administrative procedure requires an agency to treat like cases alike.” Westar Energy, Inc. v. Federal Energy Regulatory Commission, 473 F.3d 1239, 1241 (D.C.Cir. 2007). Here, the Department has failed that basic test, and its action is therefore arbitrary and capricious.
To allay concerns about the breadth of its assertion of regulatory authority in this case, the Department — consistent with its traditional practice — has repeatedly disclaimed authority under the General Duty Clause to ban, for example, tackling in the NFL or excessive speed in NASCAR races. See Br. for Secretary of Labor 52; Oral Arg. at 19:15-19:29, 33:05-33:25. As *1221 the Department no doubt realizes, the Pel-ron principle bars it from asserting such broad regulatory authority. The Department surely understands that it would find itself on shaky legal ground — not to mention face popular and congressional backlash — if it asserted such authority.
Yet the line the Department has drawn in applying the Pelron principle is entirely arbitrary and unreasonable. The Department cannot reasonably distinguish close contact with whales at SeaWorld from tackling in the NFL or speeding in NASCAR. The Department’s sole justification for the distinction is that SeaWorld could modify (and indeed, since the Department’s decision, has had to modify) its shows to eliminate close contact with whales without going out of business. But so too, the NFL could ban tackling or punt returns or blocks below the waist. And likewise, NASCAR could impose a speed limit during its races. But the Department has not claimed that it can regulate those activities. So that is not a reasonable way to distinguish sports from SeaWorld. The Department assures us, however, that it would never dictate such outcomes in those sports because “physical contact between players is intrinsic to professional football, as is high speed driving to professional auto racing.” Br. for Secretary of Labor 52. But that ipse dixit just brings us back to square one: Why isn’t close contact between trainers and whales as intrinsic to SeaWorld’s aquatic entertainment enterprise as tackling is to football or speeding is to auto racing? The Department offers no answer at all.[5]
In my view, the Department of Labor either has authority to regulate sports and entertainment so as to prevent injuries to participants, or it does not. The fact that the Department expressly disclaims its authority over the NFL and NASCAR, and that the Department goes to such lengths to draw head-scratching distinctions between sports events on the one hand and entertainment shows on the other, shows that something is up. What’s up is that the Department is treating similar cases dissimilarly, the paradigmatic arbitrary and capricious agency action. See Muwekma Ohlone Tube v. Salazar, 708 F.3d 209, 215-16 (D.C.Cir.2013); County of Los Angeles v. Shalala, 192 F.3d 1005, 1022 (D.C.Cir.1999); Transactive Corp. v. United States, 91 F.3d 232, 237 (D.C.Cir.1996) (“A long line of precedent has established that an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently.”).
Because the Department of Labor’s decision rests on illusory and arbitrary distinctions and rationales, it cannot stand.
Third, even though the Department disclaims authority to, for example, ban punt returns in the NFL or speeding in NASCAR, the Department’s action here still interferes with the sports and entertainment industry to a degree that Congress surely did not intend when it passed the Occupational Safety and Health Act.
The Congress that enacted the Act in 1970 was certainly aware of the hazards in many popular sports such as football, baseball, ice hockey, and boxing. It was also well aware of the hazards in entertainment *1222 shows such as the circus. Yet as Sea-World correctly points out, Congress did not in any way indicate or even hint that the Clause’s vague terms encompassed an implicit grant of authority to the Department of Labor to regulate and re-make some undefined swath of America’s sports and entertainment behemoth.
In the real world, it is simply not plausible to assert that Congress, when passing the Occupational Safety and Health Act, silently intended to authorize the Department of Labor to eliminate familiar sports and entertainment practices, such as punt returns in the NFL, speeding in NASCAR, or the whale show at SeaWorld. See FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 160, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (“[W]e are confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion.”).
To the extent sports or entertainment activities raise concern about the risk of injury to the participants, several extant legal bodies possess significant authority to clamp down on unreasonable dangers: Congress, state legislatures, state regulators, courts applying state tort law. I take no position here on whether Sea-World — or for that matter the NFL or NASCAR — should be subject to more stringent government regulation or liability, or otherwise should voluntarily make its activities safer. That policy question is not before us. My legal disagreement with the majority opinion boils down to one basic question: Who decides? Under current law, it is not the Department of Labor. I respectfully dissent.

. The Occupational Safety and Health Review Commission is an independent adjudicatory agency "established to settle disputes between employers and the Secretary of Labor over citations issued by the Secretary's inspectors.” Oil, Chemical & Atomic Workers International Union v. Occupational Safety & Health Review Commission, 671 F.2d 643, 652 (D.C.Cir.1982). We are technically reviewing the decision of the Commission, which in turn reviewed and upheld the Department of Labor’s citation. In this case, to the extent the Department's decision to cite SeaWorld was arbitrary and capricious, the Commission's decision to uphold that citation likewise would be arbitrary and capricious. Therefore, for ease of reference, this opinion refers to the action of the Department of Labor, the real party in interest.

. This case concerns injuries to participants, not to spectators. The Department of Labor has not claimed authority under the Occupational Safely and Health Act to prevent injuries to spectators, such as injuries caused by foul balls or flying hockey pucks. The spectators are not employees of the teams or industries and so are not within the scope of the Act. Injuries to spectators are often addressed by state tort law.

. The Pelron principle covers injuries to the participants taking part in the relevant sport or show. To be clear, consistent with Pelron, the Department of Labor of course may regulate the workplace conditions that are not the "normal activities” of the participants during the competition or show — for example, the workplace conditions for the workers who cook the hot dogs or sell the beer or build the stage or erect the goalposts, or the off-stage conditions for the event's participants. With the exception of the Spider-Man show, all of the examples listed in footnote 1 of the majority opinion are outside the scope of the Pelron rule and not responsive to this dissent. Moreover, even the Department’s action with respect to the Spider-Man show came after its action against SeaWorld in this case. The Department’s action against SeaWorld was its initial, entirely unprecedented effort to regulate the normal activities of sports events and entertainment shows.

. The majority opinion says that applying Pel-ron here would prevent the Department of Labor from regulating construction or logging or roofing, among other things. That is incorrect and just highlights, in my view, that the majority opinion is not fully appreciating or correctly analyzing the critical and novel issue presented in this case. The Department of Labor obviously has authority over those kinds of workplaces. As explained in Pelron, the Department may not completely forbid an industry from offering its product' — in the examples cited by the majority opinion, the product might be a building, timber, or a roof — but the Department of course may and frequently does attempt to reduce the risk in the workplaces where the production of those products occurs. In this case, a distinct issue arises because sports and entertainment are industries where the product being offered is a spectator event structured and marketed in a way that often includes some risk for the participants, whether it is a punt return in football or a whale show at SeaWorld. Put another way, in sports events and entertainment shows, there is no distinction between the product being offered and its production; the product is the production. That’s what makes sports events and entertainment shows analytically different from construction or logging or roofing for purposes of the Pelron principle. And that’s no doubt why the Department of Labor until recently has not seen fit to regulate the sports and entertainment industries in this way.

. The majority opinion does not try to defend the Department's effort to distinguish Sea-World from, for example, the NFL or NASCAR. Rather, the majority opinion says that SeaWorld’s argument that the Department was arbitrarily distinguishing SeaWorld from the NFL or NASCAR was not raised before the Commission and has been forfeited. But in responding in this Court to that argument by SeaWorld, the Department of Labor has not asserted forfeiture. So the Department itself forfeited any potential forfeiture argument.