# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued April 16, 2014          Decided August 15, 2014

No. 13-1194

OTIS ELEVATOR COMPANY,
PETITIONER

v.

SECRETARY OF LABOR, ET AL.,
RESPONDENTS

On Petition for Review of a Final Order of the United
States Occupational Safety & Health Review Commission

*Stephen C. Yohay* argued the cause for petitioner. With
him on the briefs were *John A. Shedden* and *Paul J. Waters*.

*Scott Glabman*, Senior Appellate Attorney, U.S.
Department of Labor, argued the cause for respondents. With
him on the brief were *Joseph M. Woodward*, Associate
Solicitor for Occupational Safety and Health, and *Heather R.
Phillips*, Counsel for Appellate Litigation.

Before: ROGERS, SRINIVASAN and MILLETT, *Circuit
Judges*.

Opinion for the Court by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: A service mechanic employed by Otis Elevator Company injured his hand while unjamming the gate of a freight elevator. The accident spurred an investigation by the Occupational Safety and Health Administration (OSHA), and ultimately a citation to Otis Elevator for violating OSHA safety standards involving the control of hazardous energy. The Occupational Safety and Health Review Commission upheld the citation, and Otis Elevator petitions for review of that decision. Specifically, Otis Elevator argues that the OSHA safety standards allegedly violated did not apply to the work its mechanic was performing at the time of the accident. Because the Commission's determinations that the safety standards applied to the mechanic's work and were violated are neither arbitrary nor capricious, and are supported by substantial evidence, we deny the petition for review.

## I. BACKGROUND

### A. Statutory and Regulatory Framework

Congress enacted the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651–678 (OSH Act), "to assure so far as possible * * * safe and healthful working conditions" for "every working man and woman in the Nation." 29 U.S.C. § 651(b). The Act charges the Secretary of Labor with promulgating workplace health and safety standards, *id*. at § 655, and imposing citations and monetary penalties on employers who fail to comply with those standards, *id.* at §§ 658–659, 666.

An employer who disagrees with the Secretary's imposition of a citation or penalty can seek review before the Occupational Safety and Health Review Commission, 29 U.S.C. §§ 651(b)(3) & 661, which must provide an objecting employer with an evidentiary hearing and a written decision

based on findings of fact, *id*. at § 659(c). *See also Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 147-148 (1991). Initially, an administrative law judge reviews the Secretary's order. 29 U.S.C. § 661(j). The Commission may, in its discretion, review the administrative law judge's decision *de novo*, without any deference to his or her fact findings, credibility judgments, or legal determinations. *Id*.; *Falcon Steel Co.*, 16 O.S.H. Cases (BNA) 1179, 1993 WL 155690, at *7 (O.S.H.R.C. 1993) ("The Commission's reviewing authority includes the authority to decide all issues it could decide as the initial decision-maker.").

Either the Secretary or the employer may seek judicial review of the Commission's final order directly in a United States court of appeals, which "must treat as 'conclusive' Commission findings of fact that are 'supported by substantial evidence.'" *Martin*, 499 U.S. at 148 (citing 29 U.S.C. § 660(a)-(b)).

In 1989, the Secretary exercised his rulemaking authority to prescribe safety requirements for "the control of hazardous energy." OSHA Control of Hazardous Energy Sources (Lockout/Tagout) Rule, 29 C.F.R. § 1910.147 (1989). That standard, commonly referred to as the "lockout/tagout" standard, "addresses practices and procedures that are necessary to disable machinery or equipment and to prevent the release of potentially hazardous energy while maintenance and servicing activities are being performed." Lockout/Tagout, 54 Fed. Reg. 36,644-01 (Sept. 1, 1989). To "lockout" or "tagout" a piece of equipment or machinery means to affix a device, or to otherwise take steps to disable equipment or machinery during maintenance or repair. *See* 29 C.F.R. § 1910.147(a)(3)(i), (b). By regulation, the lockout/tagout standard applies to "the servicing and

maintenance of machines and equipment in which the unexpected energization or start up of the machines or equipment, or release of stored energy could cause injury to employees." 29 C.F.R. § 1910.147(a)(1)(i) ("scope provision").

The Secretary charged Otis Elevator with violating a standard requiring the exchange of lockout/tagout information between on-site and outside employers involved in maintenance or repair activities. That "information exchange provision" applies "[w]henever outside servicing personnel are to be engaged in activities covered by the scope and application of this standard," and requires that "the on-site employer and the outside employer shall inform each other of their respective lockout or tagout procedures." 29 C.F.R. § 1910.147(f)(2)(i).

## B.   Factual Background

In June 2009, Otis Elevator dispatched one of its service mechanics to the Boston Store in Brookfield, Wisconsin, to repair a jammed metal gate on a freight elevator. When he arrived at the store, the mechanic spoke with a couple of Boston Store employees who confirmed that the gate on the elevator car was "hung up." An out-of-order sign had been placed near the elevator. Neither upon the mechanic's arrival nor at any other time prior to this incident did Otis Elevator provide the Boston Store with a copy of its lockout/tagout procedures.

When functioning properly, chain assemblies on the rooftop of the elevator car raise and lower the metal gate. Upon inspection, however, the mechanic found that the gate was partially open and could not be moved, leaving a three-foot gap between it and the floor.

The mechanic ducked underneath the gate, and then used a ladder to climb on top of the elevator car to perform the repair. He flipped two switches to prevent anyone from calling the elevator or moving the gate electronically. The mechanic failed, however, to block up the gate mechanically in order to prevent unexpected gate movement, as Otis Elevator's own mechanical repair processes, captioned "LOCKOUT/TAGOUT PROCEDURE," advised.

Once on top of the elevator car, the mechanic determined that the gate could not be moved because one of the chains was "off the sprocket" and jammed. He decided to fix the gate by prying the chain back onto the sprocket. Once unjammed, the chain immediately started moving. The mechanic realized that, as a result of the abrupt release of the jam, the gate was about to slam down and break the chain's connecting link. He reacted by grabbing the chain, which "drug" his hand through the sprocket and chain, resulting in a serious laceration to his finger.

## C. Procedural History

Following OSHA's investigation of the accident, the Secretary cited Otis Elevator for violating the lockout/tagout standard, 29 C.F.R. §§ 1910.147 *et seq.* Specifically, the Secretary determined that Otis Elevator failed to comply with 29 C.F.R. § 1910.147(f)(2)(i)—the lockout/tagout "information exchange provision," which required Otis Elevator, as the "outside employer" in this incident, to give advance notice to the "on-site employer," the Boston Store, of the lockout/tagout procedures it would use when it had to repair the freight elevator.

Otis Elevator contested that citation. An administrative law judge vacated it, reasoning that the lockout/tagout standard's "scope provision" did not apply because the startup

of the machine once the chain was forced back onto the sprocket was anticipated by the mechanic, not "unexpected" energization, within the meaning of 29 C.F.R. § 1910.147(a)(1)(i). *Otis Elevator Co.*, OSHRC Docket No. 09-1278, 2011 WL 10604073, at *18 (ALJ Jan. 14, 2011) ("ALJ Dec.").

The administrative law judge also ruled that Otis Elevator was not in violation of the lockout/tagout "information exchange provision," 29 C.F.R. § 1910.147(f)(2)(i), because no Boston Store employees were actually in danger of being injured. ALJ Dec. at *18. The only "zone of danger," the administrative law judge found, was on top of the elevator car, where there was no reasonable prospect of entry by anyone other than the mechanic himself. ALJ Dec. at *19.

Reviewing the case *de novo*, the Commission disagreed and reinstated the Secretary's citation. The Commission ruled, first, that the lockout/tagout standard applied to the mechanic's work. *Otis Elevator Co.*, OSHRC Docket No. 09-1278, 24 O.S.H. Cases (BNA) 1081, 2013 WL 3998034, at *2-*4 (Rev. Comm'n April 8, 2013) ("Comm'n Dec.") The Commission explained that the applicability of the lockout/tagout standard turns not on the mechanic's subjective prediction of how the machine would operate at the moment of repair, but rather on whether there was a potential for the unexpected release of stored energy that could cause injury to the mechanic or others. The Commission found such potential in this case because, as the mechanic testified, he could not predict when the jam would yield, making the sudden release of the chain "unexpected" within the meaning of 29 C.F.R. § 1910.147(a)(1)(i). Comm'n Dec. at *3.

The Commission further found that the repair posed a "caught-in" hazard to the mechanic, since a body part or piece

of clothing could have been inadvertently caught in the moving chain. It also posed a significant risk to others because, in light of the mechanic's failure to properly block up the gate consistent with Otis Elevator's procedures, the gate could have slammed shut once the chain was unjammed. Comm'n Dec. at *4 & n.3.

Having concluded that the lockout/tagout regime applied, the Commission ruled that Otis Elevator violated the information exchange provision, 29 C.F.R. § 1910.147(f)(2)(i), by failing to inform Boston Store employees of its lockout/tagout procedures prior to performing maintenance work on the elevator. Comm'n Dec. at *5-*7. The Commission reasoned that, by its own terms, the information exchange provision applies "whenever" outside service personnel are to be engaged in activities covered by the lockout/tagout standards, and not, as Otis Elevator argued, only when employees were actually affected by the work. Comm'n Dec. at *5 (quoting 29 C.F.R. § 1910.147(f)(2)(i)). In the Commission's view, the information exchange provision "presumes that in this situation a Boston Store employee may interfere with 'the restrictions and prohibitions' of Otis Elevator's energy control program," and so compliance with the provision is required "*whenever* employers engage in covered maintenance activity." Comm'n Dec. at *5 (citing *Joseph J. Stolar Construction Co.*, 9 O.S.H. Cases (BNA) 2020, 1981 WL 18789, at *5 n. 9 (O.S.H.R.C. 1981) ("The Commission has held that, when a standard prescribes specific means of enhancing employee safety, [a] hazard is presumed to exist if the terms of the standard are violated.")).

While the Commission reinstated the Secretary's citation, it reduced the penalty to $500 on the ground that the likelihood of an accident was exceptionally low because a

Boston Store employee had placed an out-of-order sign by the elevator, only a limited number of Boston Store employees were present during the early morning repair, and Boston Store employees had no responsibility for servicing the elevator while the Otis Elevator mechanic was performing his work. Comm'n Dec. at *9.

Otis Elevator timely petitioned for review.

## II. STANDARD OF REVIEW

In reviewing Commission decisions, this court accepts the Commission's findings of fact as "conclusive" if they are "supported by substantial evidence on the record considered as a whole," 29 U.S.C. § 660(a), and the Commission's application of the law to those facts will be overturned only if it is arbitrary, capricious, an abuse of discretion, or contrary to law. *See Fabi Construction Co. v. Secretary of Labor*, 370 F.3d 29, 33 (D.C. Cir. 2004) (quoting Administrative Procedure Act, 5 U.S.C. § 706(2)(a)). In addition, this court defers to the Secretary's interpretation of his own regulations unless it is unreasonable or plainly contradicts the regulation's language or purpose. *S.G. Loewendick & Sons, Inc. v. Reich*, 70 F.3d 1291, 1294 (D.C. Cir. 1995).

## III. ANALYSIS

Otis Elevator challenges the Commission's decision on two grounds. First, it contends that the lockout/tagout standards do not apply at all because there was no "unexpected" release of energy in this repair. Second, Otis Elevator argues that it had no duty to exchange information about its lockout/tagout procedures with the Boston Store because the nature, location, and timing of the repair did not put any employees or customers at risk.

Neither argument succeeds. The Commission permissibly concluded that the lockout/tagout protocols applied because there was stored kinetic energy in the jammed chain due to the weight of the gate that posed a danger to the mechanic and to anyone nearby; and the exact timing of the chain assembly's energization was unknown. The Commission likewise reasonably concluded that, to promote safety, its regulations require the proactive exchange of information in advance of repairs regardless of any *post hoc* assessment of risk on a repair-by-repair basis. For those reasons, we deny the petition for review.

## A. Applicability of the Lockout/Tagout Protocol

The lockout/tagout standard applies to the servicing and maintenance of machines and equipment "in which the unexpected energization or start up of the machines or equipment, or release of stored energy could cause injury to employees." 29 C.F.R. § 1910.147(a)(1)(i). The Commission's factual determination that the mechanic's unjamming repair triggered both prongs of that test was supported by substantial evidence, and its application of the OSHA regulations to those facts was permissible.

**1.** The Commission found that the repair entailed a release of stored energy that was both unexpected and created the potential for injury. Those findings sufficed to trigger the lockout/tagout regime, and both of them are substantially grounded in the administrative record.

*First*, the Commission found—and Otis Elevator does not dispute—that "there was stored kinetic energy in the elevator's jammed chain assembly due to the weight of the partially open gate." Comm'n Dec. at *3. Indeed, the mechanic's concern that the sudden and overlooked release of

that energy would cause the gate to slam down is what prompted him to grab the chain and lacerate his hand.  *Id.*

The Commission further found that the stored energy "could cause injury to employees." 29 C.F.R. § 1910.147(a)(1)(i).  To begin with, the mechanic himself testified that, because only one counterweight was holding the gate, "it would have slammed shut once the chain was unjammed."  Comm'n Dec. at *4 n.3.  Moreover, Boston Store employees "were present at the store and had access to the elevator gate while the Otis mechanic was servicing the elevator," putting them at risk of significant injury when that gate abruptly came down.  Comm'n Dec. at *5 n.8.

Confirming the point, Otis Elevator's "Lockout/Tagout Procedure[s]" specifically included an energy control measure—blocking up the gate with a Bi-Parting Door Tool—that would have protected against the hazard created by the gate slamming down.  Comm'n Dec. at *2 n.2; JA 378.  The mechanic neglected to employ that safety measure in this case.  *Id.*  Had he done so, he would have both eliminated the risk to the public *and* averted the concern about a crashing gate that prompted him to injure himself by grabbing the rapidly moving chain.

The repair posed a risk of injury in still another respect.  The Commission separately found that the release of the chain's stored energy "posed a caught-in hazard to the mechanic" himself, because "his work necessarily placed him in close proximity to [the chain], and a body part or piece of clothing could have been inadvertently caught in the chain, or between it and the sprocket, when the stored energy released."  Comm'n Dec. at *4.  The mechanic's own testimony and conduct substantiated the Commission's judgment.  He admitted that he was close enough to the chain to grab it with

his hand—in fact, he did just that—which meant he was also close enough to get his clothes or a body part inadvertently caught in the moving chain.

*Second*, the Commission found that the repair involved "unexpected energization." 29 C.F.R. § 1910.147(a)(1)(i). Specifically, while the mechanic knew that the chain assembly would start to move once it was unjammed, the mechanic could not "predict when the jam would yield." Comm'n Dec. at *3.

Otis Elevator stresses that the mechanic knew *what* would happen when the repair occurred, and thus the release of energy was not "unexpected." But what is critical to the standard's application in this case is that the mechanic did not know *when* that moment would arrive. No mechanism on the elevator, for instance, signaled when the jam would yield or the chain would begin to move.

This case thus is unlike *Reich v. General Motors Corporation*, 89 F.3d 313 (6th Cir. 1996), on which Otis Elevator relies. In *Reich*, the machines under repair were specifically designed not to start up until an eight to twelve step process was completed, and "audible or visual signals * * * alerted servicing employees that the machines were about to start up." *Id*. at 314-315. Here, by contrast, the only notice the mechanic had that the chain assembly would start moving was the movement itself. Indeed, as the Commission found, "the mechanic's own testimony shows that the release of energy surprised him." Comm'n Dec. at *3.

Otis Elevator also argues that the finding of unexpected energization contradicts the administrative law judge's finding that the mechanic "expected" the gate to move once he placed the chain back on to the sprocket. That argument misses the mark because it overlooks both (i) the

Commission's focus on when, not whether, the chain assembly would energize, and (ii) the Commission's full authority under the OSH Act to find facts independently without any deference to the administrative law judge. 29 U.S.C. § 661; *see Falcon Steel Co.*, 1993 WL 155690, at *7.

**2.** Just as we find no factual error in the Commission's determinations, we hold that the Commission's application of the OSHA regulations to those substantiated facts was neither arbitrary nor capricious.

To begin with, the plain text of the lockout/tagout standard extends to the "*unjamming of machines or equipment* * * * where the employee may be exposed to the unexpected energization or start up of the equipment or release of hazardous energy." 29 C.F.R. § 1910.147(b) (emphasis added). Indeed, in promulgating the final rule, OSHA not only repeatedly cites "unjamming" work as one of the activities covered by the standard, *see* 54 Fed. Reg. at 36,646, 36,647, 36,648, 36,652, 36,661 & 36,688, but in fact lists "unjamming object(s) from equipment" as statistically the most common source of the workplace injuries that the standard seeks to prevent, *see id.* at Tables III & XII.

In that vein, the Commission's conclusion that the lockout/tagout standard applies also comports with the standard's preventative purpose. *See Buffalo Crushed Stone, Inc. v. Surface Transportation Board,* 194 F.3d 125, 128 (D.C. Cir. 1999) ("We will defer to the agency's interpretation so long as it 'sensibly conforms to the purpose and wording of the regulations.'") (quoting *Martin*, 499 U.S. at 150-151). As OSHA explained in promulgating the final rule, one of "the most effective method[s] to prevent employee injury caused by the unanticipated movement of a component of a machine" is to "utilize a restraining device to

prevent movement," such as "by blocking material or components." 54 Fed. Reg. at 36,647. Indeed, such blocking of the elevator gate was the very mechanism that Otis Elevator's own lockout/tagout procedures prescribed, but the mechanic omitted. Comm'n Dec. at *2 n.2; JA 383. That close similarity between the hazards identified in the preamble to the rule and the activity that prompted the citation reinforces the reasonableness of the enforcement action. *See Burkes Mechanical, Inc.*, 21 O.S.H. Cases (BNA) 2136, 2007 WL 2046814, at *5 (O.S.H.R.C. 2007).

The Commission's decision also comports with prior agency decisions. In *Dayton Tire*, 23 O.S.H. Cases (BNA) 1247, 2010 WL 3701876, at *4 (O.S.H.R.C. 2010), *aff'd in relevant part by Dayton Tire v. Secretary of Labor*, 671 F.3d 1249 (D.C. Cir. 2012), *General Motors*, 22 O.S.H. Cases (BNA) 1019, 2007 WL 4350896, at *3 (O.S.H.R.C. 2007), and *Burkes Mechanical, Inc.*, 2007 WL 2046814, at *4 n.4, the Commission held that the lockout/tagout standard applied to repairs that, as here, provided the employees no advance notice of when the machine or equipment would release stored energy, *see Dayton Tire*, 2010 WL 3701876, at *4; *General Motors*, 2007 WL 4350896, at *3; *Burkes Mechanical*, 2007 WL 2046814, at *4 n.4.

For those reasons, it was neither arbitrary nor capricious for the Commission to find that the lockout/tagout standard applied to the unjamming activity being performed by the Otis Elevator mechanic in this case.

## B.   Applicability of the Information Exchange Rule

The Commission cited Otis Elevator for failing to exchange its lockout/tagout procedures with the Boston Store before conducting the repair, as required by 29 C.F.R. § 1910.147(f)(2)(i). Otis Elevator objects that, in so ruling,

the Commission wrongly presumed that this failure exposed employees to a hazard, rather than proved the actual existence of that danger. We hold that the Commission's interpretation and application of its regulation was reasonable as a matter of fact and law.

The citation was factually reasonable because the Commission specifically found that the mechanic's repair work exposed Boston Store employees in the building to a zone of danger in that they "were present at the store and had access to the elevator gate while the Otis mechanic was servicing the elevator," and the slamming down of the gate could have harmed a person in its path. Comm'n Dec. at *4 n.3 & *5 n.8.

Once employee exposure to the repair area—including the elevator gate—was established, the Commission's interpretation of the regulation to presume a hazard to those employees from the failure to exchange information was also legally reasonable. OSHA standards are "unofficially divided" into "specification" and "performance" standards. *See* Mark A. Rothstein, Occupational Safety & Health Law § 5:3 (2013 ed.). Specification standards "detail the precise equipment, materials, and work processes required to eliminate hazards," while performance standards "indicate the degree of safety and health protection to be achieved, but are more flexible and leave the method of achieving the protection to the employer." *Id.* (citing *Secretary of Labor v. Thomas Industrial Coatings, Inc.*, 21 O.S.H. Cases (BNA) 2283, 2007 WL 4138273 (O.S.H.R.C. 2007)).[*]

---

[*]*See also Joseph J. Stolar Construction Co.*, 1981 WL 18789, at *5 n.9 ("When a standard prescribes specific means of enhancing employee safety, a hazard is presumed to exist if the terms of the standard are violated."); *Fabricated Metal Products, Inc.*, 18

In this case, the Commission fairly read the exchange provision to be a specification standard that presumes a hazard if information is not exchanged and, for that reason, categorically requires the exchange of lockout/tagout information in advance of any covered repair work. Comm'n Dec. at *5 & n.7.

To begin with, that reading is grounded in the regulation's plain text, which provides that the repair company and the on-site employer "*shall* inform each other" about their respective lockout or tagout procedures "*whenever* outside personnel are to be engaged in activities covered by the scope and application of this standard." 29 C.F.R. § 1910.147(f)(2)(i) (emphases added); *see also* 54 Fed. Reg. at 36,680 (the exchange provision's requirements "are *necessary* when outside personnel work on machines or equipment") (emphasis added). The regulation's use of mandatory directives like "shall" and "whenever" defy the optionality in operation that Otis Elevator favors.

The preamble to the rule's promulgation echoes the presumption of risk, explaining that the exchange provision "ensure[s] that both the employer and the outside service personnel are aware that their interaction can be a possible source of injury to employees and that the close coordination

O.S.H. Cases (BNA) 1072, 1997 WL 694096, at *2 n.4 (O.S.H.R.C. 1997) ("As to a specification standard * * * proof of noncompliance with the standard establishes the existence of a hazard."); *see also* Occupational Safety & Health Law § 5:24 ("Before promulgating a standard the Secretary is required to consider the need for each measure of safety and health protection. Therefore, the Secretary is not ordinarily required to prove the existence of a hazard each time a standard is enforced because the promulgation of a standard presupposes the existence of a hazard.") (collecting cases).

of their activities is needed in order to reduce the likelihood of such injury." 54 Fed. Reg. at 36,680-36,681. Requiring the Secretary to prove actual risk on a case-by-case basis would erode the regulation's prophylactic protection.

Otis Elevator presses five challenges to the Commission's interpretation, but none of them succeed. *First*, Otis Elevator points to OSHA's Lockout/Tag-Out Compliance Directive, CPL 02-00-147 (Feb. 11, 2008), which establishes OSHA's enforcement policy for its lockout/tagout standard. The Directive, at one point, describes the information exchange process as "performance-oriented." OSHA Directive at 3-57. Read in context, however, the reference to "performance-oriented" applies to *which* energy control procedures to use—the service company's, the on-site employer's, or a combination thereof. *See id.* ("The performance-oriented nature of the standard permits the outside (contractor) employer to use either: the host employer's energy control procedure, which some companies will require; its own procedures; or a combination of the two procedures, provided the resulting procedure meets the requirements of the [lockout/tagout] standard.").

The Directive, in other words, used its "performance-oriented" language to clarify that the mandatory exchange of information does not eliminate the service company's on-site discretion to select which of those exchanged procedures is most appropriately employed in undertaking a repair. Importantly, at no point does the Directive suggest that employers are free to choose *whether* they will comply with the information exchange provision at all. Quite the opposite, the Directive states just a few sentences later that "[o]n-site employers and outside employers *must* inform each other of their respective [lockout/tagout] procedures." *Id.* (emphasis added).

*Second*, Otis Elevator invokes a paragraph in the OSHA Directive stating that, "in all cases, the decision to issue § 1910.147 citations to the host or contractor employer should be based on all of the relevant facts and the established policy for exposing, creating, correcting, and controlling employers." *Id.* at 2-31. But that provision simply empowers the *Secretary* to exercise prosecutorial discretion in issuing citations; it in no way invests regulated companies with the discretion to pick and choose whether and when to comply with the regulation.

*Third*, Otis Elevator argues that the Commission failed to consider "industry practice" that purportedly treats the information exchange obligation with greater flexibility. Because the Commission's interpretation of the regulation is reasonable, however, "no reference to industry practice is necessary." *Brock v. L.R. Willson & Sons, Inc.*, 773 F.2d 1377, 1387 (D.C. Cir. 1985).

*Fourth*, Otis Elevator objects that the Secretary's citation imposed a "new" interpretation of the regulation in the course of adjudication, without fair notice. But the Secretary's interpretation as adopted by the Commission is grounded in a reasonable reading of the regulation's text and purpose, and for that reason, this court must defer "even where the Secretary offers his interpretation in the context of litigation before the Commission." *S.G. Loewendick & Sons, Inc.*, 70 F.3d at 1294. That is because "[t]he Secretary's interpretation of OSH Act regulations in an administrative adjudication * * * *is* agency action, not a *post hoc* rationalization of it." *Id.* (quoting *Martin*, 499 U.S. at 157).

To be sure, this court will not hew to that rule if the Secretary makes such an abrupt change to a longstanding interpretation that the cited party is effectively deprived of

"fair notice." *See Fabi Construction Co. v. Secretary of Labor*, 508 F.3d 1077, 1086-1089 (D.C. Cir. 2007) (no deference where the Secretary had consistently excluded certain work from coverage under the regulation, and the Secretary's new reading was not discernible from regulatory text). But that is not this case. Otis Elevator has not identified any pattern of contrary practice by the Secretary or contrary interpretations by the Commission. Rather, Otis Elevator, "by reviewing the regulations and other public statements issued by the agency," should have been "able to identify, with ascertainable certainty, the standards with which the agency expects parties to conform." *Id.* at 1088 (quoting *General Elec. Co. v. EPA,* 53 F.3d 1324, 1329 (D.C. Cir. 1995)) (internal quotation marks and citation omitted).

*Fifth* and finally, Otis Elevator argues that it did not violate the information exchange provision because the mechanic's repair work did not require any lockout or tagout procedures. However, the Commission found otherwise, noting specifically that "Otis's LOTO [lockout/tagout] procedures required its mechanic 'to block up [the gate] mechanically or with a Bi-Parting Door Tool to prevent unexpected gate movement,'" and "Otis does not dispute that the mechanic failed to do this." Comm. Dec. at *2 n. 2. Indeed, this finding is amply supported by that fact that the "LOCKOUT/TAGOUT PROCEDURE" section of Otis Elevators' own safety manual explicitly states that "all sources of stored energy must be neutralized," and "mechanical blocking is required" when working on an elevator. JA 383.

\* \* \* \* \*

In sum, we hold that the Commission's finding that Otis Elevator engaged in maintenance activities covered by the lockout/tagout standard, 29 C.F.R. § 1910.147(a)(1)(i), was

both reasonable and supported by substantial evidence.  We further hold that the Commission reasonably affirmed the Secretary's citation for violation of the information exchange provision, 29 C.F.R. § 1910.147(f)(2)(i).  The Commission's Decision and Order accordingly is affirmed.

*So ordered.*