Argued and submitted December 30, 2019; reversed on petition, affirmed on cross-petition February 26, 2020

OREGON OCCUPATIONAL SAFETY
AND HEALTH DIVISION,
*Petitioner*
*Cross-Respondent,*

*v.*

A & B SHEET METAL WORKS, LLC,
*Respondent*
*Cross-Petitioner.*

Workers' Compensation Board
1600014SH; A165656

461 P3d 1094

The Oregon Occupational Safety and Health Administration (OR-OSHA) cited respondent, A & B Sheet Metal Works, LLC, for violating 29 CFR section 1910.1025(d)(2), which requires an employer to conduct an initial determination whether any employee may be exposed to lead at or above an "action level" of 30 microns per cubic meter of air. Respondent contested the citation, and an administrative law judge vacated the citation, reasoning that, although respondent's actions did not constitute an "initial determination," as required under the rule, given that subsequent testing established that the lead levels were well below the action level, the failure to conduct a determination did not expose any employees to hazardous conditions. Both parties petition for review of that decision. *Held*: Respondent's reliance on smoke testing performed by the manufacturer of exhaust systems on the work site and assurances from the prior owner failed to meet the legal standard for an "initial determination." It is undisputed that respondent's employees were exposed to lead as part of their job duties. The fact that the amount of lead ultimately was determined to be below the level at which additional regulatory actions are triggered does not render the failure to initially determine that exposure a nullity.

Reversed on petition; affirmed on cross-petition.

Erin K. Galli, Assistant Attorney General, argued the cause for petitioner-cross-respondent. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

James S. Anderson argued the cause for respondent-cross-petitioner. Also on the briefs were George W. Goodman and Cummins, Goodman, Denley & Vickers, P.C.

Before Ortega, Presiding Judge, and Shorr, Judge, and James, Judge.

JAMES, J.

Reversed on petition; affirmed on cross-petition.

**JAMES, J.**

The Oregon Occupational Safety and Health Administration (OR-OSHA) cited respondent, A & B Sheet Metal Works, LLC (A & B), for "[a] violation of 29 CFR § 1910.1025(d)(2) requiring an initial determination be made to determine if any employee may be exposed to lead at or above the action level," a federal regulation adopted in Oregon by reference pursuant to the Oregon Safe Employment Act (OSEA); *see* OAR 437-003-0001(24)(d) (Sept 26, 2007). A & B contested the citation and requested an administrative hearing before an administrative law judge (ALJ) of the Hearings Division of the Workers' Compensation Board. The ALJ found that:

> "[A & B] is a specialty metal fabrication shop that, among other things, makes lead roof jacks used on tile roofs. The current owner, Mr. McInnis, purchased the business 'a couple of years ago,' keeping on all the existing employees, and renaming the business A & B Sheet Metal Works, LLC. At the time of the purchase, Mr. McInnis had some concerns about lead outgassing resulting from soldering. Nonetheless, he did not make arrangements for air sampling or exposure studies to be performed. Rather, he relied on smoke testing performed by the manufacturer of the shop's exhaust systems and assurances from the prior owner that lead monitoring had been performed to allay his concerns."

Additionally, the ALJ found that subsequent testing by a Senior Health Compliance Officer determined that the airborne lead levels at A & B were "8.3 microns per cubic meter over an 8-hour period." 29 CFR section 1910.1025(d)(2) prohibits exposure to lead at or above 50 microns per cubic meter and requires specified employer actions when levels reach 30 microns per cubic meter.

Applying those factual findings, the ALJ concluded that A & B's actions—specifically, reliance on smoke testing performed by the manufacturer of the shop's exhaust systems and assurances from the prior owner—did not constitute a "determination" under 29 CFR section 1910.1025 (d)(2). However, given that subsequent testing established that the lead levels at A & B were well below 50 microns per cubic meter, the ALJ reasoned that the failure to conduct

a determination compliant with 29 CFR section 1910.1025 (d)(2) did not "expos[e] any employees to a hazardous condition." Relying on our decision in *OR-OSHA v. Moore Excavation, Inc.*, 257 Or App 567, 307 P3d 510 (2013), the ALJ vacated the citation.

Both parties petitioned for review of the ALJ's decision. On petition, OR-OSHA argues that the ALJ erred in importing an "actual exposure" requirement to an initial determination violation. On cross-petition, A & B argues that the ALJ was correct in requiring OR-OSHA to establish actual exposure, but that the ALJ erred in finding that A & B's actions did not meet the standards of a "determination" under 29 CFR section 1910.1025(d)(2).

We address each argument below. Regarding the ALJ's decision that A & B's actions were insufficient to constitute a determination under 29 CFR section 1910.1025 (d)(2), we affirm. Regarding the ALJ's decision that because the airborne lead levels were subsequently determined to be 8.3 microns per cubic meter over an eight-hour period, and, therefore, the failure to initially determine the levels did not expose any employees to a hazardous condition, we reverse.

Whether the ALJ correctly imputed an actual exposure requirement to an initial determination citation is a question of law, reviewed for errors of law, pursuant to ORS 183.482(8)(a). Further, whether A & B's undisputed actions meet the standard of an initial determination under 29 CFR section 1910.1025(d)(2) is a question of law, reviewed for errors of law.

The facts underlying this case are largely undisputed. A & B is an Oregon business employing five individuals that was acquired in approximately 2014, by McInnis. McInnis purchased the property and the equipment from the former owner, who had operated a similar business under the name "A & B Sheet Metal, Inc." McInnis hired the former owner's employees. One of the products made by A & B was lead roof jacks used on tile roofs, the creation of which involved soldering and ventilation equipment. That soldering and ventilation equipment was present when McInnis purchased the business.

While evaluating the purchase of the business, McInnis recognized that the existing work processes involved some lead soldering, which might continue to be part of his new business activities. McInnis had some concern about off-gassing from the lead soldering, so he engaged consultants from Jones Welding and "Air Gas." They provided input concerning the condition of the existing equipment as well as whether there was sufficient air movement through the shop areas where plasma cutting and soldering were taking place. They did not, however, measure the presence of lead in the air around those stations in a quantifiable manner.

McInnis also consulted with the prior owner of the business and equipment, Smautz, regarding his safety concerns. Smautz advised McInnis that air sampling and monitoring was previously performed several times on the soldering station as well as in another area of the building. However, no records were provided. Smautz advised that the results had been negative for hazardous exposures. Smautz recommended McInnis perform smoke tests every month to ensure the ventilation system was continuing to function effectively. He demonstrated performance of the smoke tests for McInnis. Following his purchase of the equipment, McInnis continued to perform smoke tests, which he described as follows:

> "[T]hey have these little smoke bombs that you get and you can put them behind your [*sic*] with somebody standing there, you can put them in front or you can set them throughout the room and turn the fan on and watch the smoke [and] how it travels[.]"

In August 2015, Davis, a compliance officer with OR-OSHA, visited A & B for a general inspection. Davis scheduled a time to return to the site to get a baseline of potential lead exposures to employees who performed soldering work. Davis also indicated that she would like to review any previous air sampling or employee exposure studies that A & B possessed.

On her return visit approximately three weeks later, Davis conducted monitoring and took air samples. A & B did not produce any previous air sampling or employee exposure

studies. Testing on Davis's samples showed an airborne concentration of lead of 8.3 μg/m³. OR-OSHA cited employer for failing to make the initial determination of lead exposure required by 29 CFR section 1910.1025(d)(2). Specifically, the citation alleged:

> "An initial determination was not made to determine if any employee may be exposed to lead at or above the action level:
>
> > "[]At the time of the inspection, the employer did not ensure that a baseline or initial monitoring was performed for employees soldering lead metal with lead solder. The employees fabricate lead roof jacks."

OR-OSHA classified the violation as "other than serious" and proposed a penalty of $0.

We turn now to the merits. The OSEA mandates that employers "furnish employment and a place of employment which are safe and healthful for employees." ORS 654.010; *see also* ORS 654.003. The OSEA permits the Director of the Department of Consumer and Business Services to adopt by reference federal regulations regarding workplace safety. ORS 654.035; OAR 437-002-0360(21)(d).

In 1978, the federal Occupational Safety and Health Administration (federal OSHA) issued the final standard for occupational exposure to lead. *See United Steelworkers of America, AFL-CIO-CLC v. Marshall*, 647 F2d 1189, 1202 (DC Cir 1980) (explaining genesis of federal lead regulations). Those regulations, which Oregon adopted by reference, apply to any workplace, other than a construction site, where "lead is present *** in any quantity." 29 CFR § 1910.1025, Appendix B(II).

Under 29 CFR section 1910.1025(c)(1), employers must "assure that no employee is exposed to lead at concentrations greater than fifty micrograms per cubic meter of air (50 ug/m³) averaged over an 8-hour period." Prior to that ceiling, however, the regulation sets an "action level" when an employee, "without regard to the use of respirators," is exposed "to an airborne concentration of lead of 30 micrograms per cubic meter of air (30 ug/m³) averaged over an 8-hour period." 29 § CFR 1910.1025(b).

Because the regulatory scheme—both the ceiling and the action level—are tied to specific quantifiable amounts of airborne lead, the regulation requires employers to perform a determination of lead levels, essentially identifying an initial baseline. 29 CFR section 1910.1025(d)(2) requires that "[e]ach employer who has a workplace or work operation covered by this standard shall determine if any employee may be exposed to lead at or above the action level" of 30 μg/m³.

The method of that determination is covered in 29 CFR section 1910.1025(d)(3), which provides:

"Basis of initial determination.

"(i)  The employer shall monitor employee exposures and shall base initial determinations on the employee exposure monitoring results and any of the following, relevant considerations:

"(A)  Any information, observations, or calculations which would indicate employee exposure to lead;

"(B)  Any previous measurements of airborne lead; and

"(C)  Any employee complaints of symptoms which may be attributable to exposure to lead.

"(ii)  Monitoring for the initial determination may be limited to a representative sample of the exposed employees who the employer reasonably believes are exposed to the greatest airborne concentrations of lead in the workplace.

"(iii)  Measurements of airborne lead made in the preceding 12 months may be used to satisfy the requirement to monitor under paragraph (d)(3)(i) if the sampling and analytical methods used meet the accuracy and confidence levels of paragraph (d)(9) of this section."

29 CFR § 1910.1025(d)(3).

Paragraph (d)(9), referenced in the initial determination section, states:

"Accuracy of measurement. The employer shall use a method of monitoring and analysis which has an accuracy (to a confidence level of 95%) of not less than plus or minus 20 percent for airborne concentrations of lead equal to or greater than 30 μg/m³."

The results of the initial determination dictate the subsequent employer obligations:

"(4)   Positive initial determination and initial monitoring.

"(i)   Where a determination conducted under paragraphs (d)(2) and (3) of this section shows the possibility of any employee exposure at or above the action level, the employer shall conduct monitoring which is representative of the exposure for each employee in the workplace who is exposed to lead.

"(ii)   Measurements of airborne lead made in the preceding 12 months may be used to satisfy this requirement if the sampling and analytical methods used meet the accuracy and confidence levels of paragraph (d)(9) of this section.

"(5)   Negative initial determination. Where a determination, conducted under paragraphs (d)(2) and (3) of this section is made that no employee is exposed to airborne concentrations of lead at or above the action level, the employer shall make a written record of such determination. The record shall include at least the information specified in paragraph (d)(3) of this section and shall also include the date of determination."

29 CFR § 1910.1025(d)(4), (5).

In its cross-petition, A & B argues that OR-OSHA cited it for a violation of 29 CFR section 1910.1025(d)(2), which requires that "[e]ach employer who has a workplace or work operation covered by this standard shall determine if any employee may be exposed to lead at or above the action level." To A & B, it is significant that it was not cited under subsection (3). A & B argues that subsection (2) is a "performance standard," and, therefore, an employer is not required to perform that determination in any particular manner and may rely on its own subjective assessment whether there is actionable exposure. A & B accepts that subsection (3) provides greater specification, but argues that any requirements under that subsection are inapplicable, because it was only cited under subsection (2).

A & B is correct that some courts and scholars have recognized an "unofficial" distinction in OSHA regulations between "specification" and "performance" standards. *See, e.g.*, Mark A. Rothstein, *Occupational Safety & Health Law*

§ 5:13 (2013 ed); *Otis Elevator Co. v. Secretary of Labor*, 762 F3d 116, 124 (DC Cir 2014). According to those limited sources, specification standards "detail the precise equipment, materials, and work processes required to eliminate hazards," while performance standards "indicate the degree of safety and health protection to be achieved, but are more flexible and leave the method of achieving the protection to the employer." *Secretary of Labor v. Thomas Industrial Coatings, Inc.*, 21 OSH Cas (BNA) 2283, 2007 WL 4138237 (OSHRC 2007)).

However, A & B's reliance on this "unofficial" distinction misperceives the issue. Here, what constitutes a "determination" under 29 CFR section 1910.1025(d)(2) is a question of law, requiring an interpretation of the rule. In interpreting an administrative rule we apply the same analytical framework that applies to the interpretation of statutes. *State v. Hogevoll*, 348 Or 104, 109, 228 P3d 569 (2010). The only difference from statutory interpretation is that, in the instance of an administrative rule, we generally give significant deference to the agency's interpretation and are required to affirm that determination if "plausible." An agency's interpretation is "plausible" if it is not inconsistent with the wording of the rule itself or with the rule's context, or with any other source of law. *Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 142, 881 P2d 119 (1994).[1] But, apart from that deference, our approach to administrative rule interpretation follows the traditional analytical model for statutory interpretation beginning with an examination of the text and context of the rule, followed by a consideration of the history of its enactment to the extent we deem it appropriate. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009) (explaining methodology).

Here, the text and context of the rule establishes that the "determination" in 29 CFR section 1910.1025(d)(2)

---

[1] We note that the deference to be afforded a state agency's interpretation of an adopted federal rule is an open question in Oregon. *Oil Re-Refining Co. v. Environmental Quality Comm.*, 361 Or 1, 10-12, 388 P3d 1071 (2017) ("This court has not previously addressed the question of whether we should defer to an agency's interpretation of a federal rule that the agency has incorporated into its own rule by reference." (Internal citation omitted.)). Because our disposition here does not turn on agency deference, we need not resolve that question.

requires quantifiable testing. First, the "determination" in subsection (2) references the "action level." The action level is not subjective. It is explicitly tied to a quantifiable sampling result: 30 μg/m³. Further, subsection (2) cannot be read in isolation, as A & B argues. It exists within the broader context of the rule, which includes subsection (3). That subsection specifies the standards for an "initial determination." In addition, within the rule is paragraph (d)(9), which sets even further quantifiable standards over determinations, requiring "method[s] of monitoring and analysis which has an accuracy (to a confidence level of 95%) of not less than plus or minus 20 percent for airborne concentrations of lead equal to or greater than 30 μg/m³."

A & B argues that the "determination" of subsection (2) is distinct from the "initial determination" of subsection (3). That is an unsupportable reading of the rule. A & B offers no persuasive authority from any jurisdiction that has read the rule to create such a distinction, nor any legislative history in support of such a reading. Rather, the sections are part of the same rule, governing the same subject, and creating a unified scheme. Ordinarily, "text should not be read in isolation but must be considered in context." *Stevens v. Czerniak*, 336 Or 392, 401, 84 P3d 140 (2004) (internal citation omitted). Context includes other provisions of the same statute or rule. *Vsetecka v. Safeway Stores, Inc.*, 337 Or 502, 508, 98 P3d 1116 (2004) (internal citation omitted). Accordingly, we conclude that the "determination" in 29 CFR section 1910.1025(d)(2) is the "initial determination" specified in 29 CFR section 1910.1025(d)(3) and subject to the requirements of 29 CFR section 1910.1025(d)(9).

On this record, it is undisputed that A & B did not perform quantifiable testing or sampling that could determine, with "an accuracy (to a confidence level of 95%) of not less than plus or minus 20 percent" that the airborne concentrations of lead were under, equal to, or greater than 30 μg/m³. Accordingly, the ALJ did not err in determining that A & B's actions, in particular its reliance on smoke testing performed by the manufacturer of the shop's exhaust systems and assurances from the prior owner, failed to meet the legal standard for a "determination" under 29 CFR section 1910.1025(d)(2).

We turn now to the issue at the heart of OR-OSHA's appeal—the ALJ's determination that, in light of subsequent testing which showed air concentration levels below the action level, OR-OSHA could not establish exposure to any hazardous condition, thus rendering any violation noncitable. In reaching that conclusion, the ALJ relied on our decision *Moore*. Appropriately then, our analysis begins there.

In *Moore*, the employer was cited for failure to tag and withdraw from service a damaged portable ladder in violation of 29 CFR section 1926.1053(b)(16). *Moore Excavation, Inc.*, 257 Or App at 568 (quotation marks omitted). The employer conceded that a violation of the regulation had occurred, but argued that OR-OSHA had failed to prove that, as a result of the violation, it was "reasonably predictable" that a worker would have become exposed to the hazard created by that violation. *Id*. The ALJ ultimately agreed, reasoning

> "First, it is obvious that the 'zone of danger' here is restricted to use of the damaged ladder itself. * * * [H]ere, a violation would be established if it were reasonably predictable that, as a result of employer's failure to tag and/ or withdraw from service the defective ladder, an employee would attempt to use the damaged ladder. Although there was conflicting testimony regarding whether the gate to the fenced work site here was locked, there is no persuasive evidence that the work site itself was an active site during the time the defective ladder was stored there."

*Id*. at 571 (internal citation and emphasis omitted).

We began our analysis in *Moore* by discussing our earlier decision in *OR-OSHA v. David A. Mowat & ML Mowat Co.*, 237 Or App 576, 240 P3d 748 (2010), where we recognized the distinction between conditions that must be proved hazardous, versus conditions that are presumed hazardous under the regulatory scheme. In *Moore*, the parties did not dispute that the condition—defective safety equipment—was presumed hazardous. We agreed with that concession, but noted that, under the facts of *Moore*, merely because a condition was presumptively hazardous did not obviate OR-OSHA from the need to show exposure to that hazard.

"A regulation mandating that employers mark damaged and unsafe equipment (*e.g.*, a broken ladder) and remove it from service implicitly presumes that, if left unmarked and accessible, that damaged and unsafe equipment will present the hazard that a worker may use it. OR-OSHA was therefore not required to prove that Moore's failure to tag and remove the ladder from the worksite created a hazardous condition for employees. However, the fact that OR-OSHA did not need to prove that a violation of 29 CFR section 1926.1053(b)(16) created a hazardous condition did not relieve it of its burden to prove employee exposure to that hazardous condition."

*Id*. at 572-73.

Ultimately, we concluded that:

"As set forth by a leading treatise, federal law dictates that the agency must show, in the absence of proof of actual exposure, that 'it is reasonably predictable that employees, by "operational necessity" or otherwise (including inadvertence) in the course of their work or associated activities (*e.g.*, going to rest rooms) will be in the zone of danger created by the cited condition.'"

*Id*. at 577 (citing Randy S. Rabinowitz ed., *Occupational Safety and Health Law* 83 (2d ed 2002) (citations omitted)).

A & B argues here, as it did before the ALJ, that *Moore* compels the conclusion that its failure to perform initial testing is a noncitable violation. According to A & B, "the evidence presented at [the hearing] * * * established there was no employee endangerment from exposure to the potential hazard. OR-OSHA simply did not carry its ultimate burden of proof to prove by a preponderance of evidence that a hazard existed and employees were endangered by exposure to such hazard."

A & B's argument, and the ALJ's reasoning here, misconstrues the nature of the hazard, and subsequently, the exposure to that hazard. The nature of the hazard of lead exposure in the workplace was thoroughly discussed by the D. C. Circuit shortly after the federal standards were adopted:

"For centuries we have recognized the health hazards of [lead] use. We learned long ago that lead absorption

through inhalation and ingestion could cause printers to lose movement in their fingers, and pottery and glass workers to suffer the 'dry grippe.' For almost a century we have known that excessive lead absorption can injure the kidneys and the peripheral and central nervous systems of painters, plumbers, and industrial workers. We do not know to a scientific certainty that precise levels of air-lead exposure or blood-lead content at which different lead-induced diseases occur."

*United Steelworkers of America, AFL-CIO-CLC*, 647 F2d at 1203-06.

A & B frames the purpose of the regulatory scheme as protecting employees from a particular hazard: exposure to lead above 50 microns per cubic meter. But that is incorrect. The purpose of the regulation is to protect employees from the hazard of lead exposure generally. Lead exposure falls into the category of presumptive hazards. Hence, the regulations apply to any workplace, "where lead is present *** *in any quantity*." 29 CFR § 1910.1025, Appendix B(II) (emphasis added); 43 Fed Reg 52985 (Nov 14, 1978) ("This standard for occupational exposure to lead is applicable to all employment and places of employment over which OSHA has statutory jurisdiction and in which lead, *in any amount*, is present in an occupationally related context." (Emphasis added.)).

This understanding of the nature of the hazard and exposure at issue is in keeping with other jurisdictions. OR-OSHA has pointed to some federal cases, that while not considering initial lead testing, do involve initial testing schemes in other contexts.[2] We find one of those cases especially instructive: *Marshall v. Western Electric, Inc.*, 565 F2d 240 (2d Cir 1977), *abrogated on other grounds by Martin v. Occupational Safety and Health Review Com'n*, 499 US 144, 111 S Ct 1171, 113 L Ed 2d 117 (1991). There,

---

[2] Because the OSEA has a federal regulatory counterpart, we can look to federal case law as persuasive authority. *See OR-OSHA v. Don Whitaker Logging, Inc.*, 329 Or 256, 263, 985 P2d 1272 (1999) (in deciding cases under the OSEA, Oregon courts may look to federal case law for guidance where the rule at issue has a "counterpart in the federal [OSHA]"); *see also Moore Excavation*, 257 Or App at 575 (listing examples of Oregon appellate opinions that rely on federal case law for guidance in deciding cases under the OSEA); and *OR-OSHA v. CBI Services, Inc.*, 356 Or 577, 594, 341 P3d 701 (2014) (federal cases "could be persuasive, depending on the force of their own reasoning" to deciding the meaning of a state statute).

the court considered whether Western Electric violated the emergency temporary vinyl chloride standard of *former* 29 CFR section 1910.93q(c)(1), *replaced in part by* 29 CFR section 1910.1017(d), when it failed to make an initial determination as to whether employees were exposed to vinyl chloride in concentrations exceeding 50 parts per million (ppm). In a factual situation remarkably similar to here, in *Marshall,* an OSHA compliance officer, during a routine visit to the site, learned that the air in one area of the site had not been tested. The compliance officer tested air samples. The testing revealed vinyl chloride in the air at a concentration of 1.7 ppm—below actionable levels.

Western Electric argued that, although it failed to monitor part of its work site, the citation was unsupportable because subsequent testing showed that the concentration of vinyl chloride in the air was well below the dangerous concentration of 50 ppm. *Marshall*, 565 F2d at 243 n 4. The Second Circuit rejected that argument, noting,

> "[t]he standard required initial monitoring of all such areas and subsequent monitoring on a monthly or weekly basis depending on whether or not vinyl chloride concentrations exceeded 50 ppm. The monitoring requirements were the device which triggered into operation a compliance program for protecting workers against over-exposure to vinyl chloride and which checked the effectiveness of the program."

*Id*. at 244. The court reasoned that subsequent testing showing compliant values did not render the failure to conduct the initial test a noncitable violation:

> "If, in some circumstances, formal physical monitoring simply confirms the predicted safety of the working environment, it is a very useful act from the point of view of the employee whom the standard is designed to protect."

*Id*. at 245. Ultimately, the court found that the Secretary's interpretation that initial monitoring was required in any work environment where vinyl chloride was released was the "only reasonable interpretation of the standard." *Id*.[3]

---

[3] Additionally, the federal Occupational Safety Health Review Commission, in construing the "initial determination" requirement, has also applied the same

We agree. Here, the hazard is the presence of lead in the workplace generally, *at any level*—a fact that is undisputed by the parties. As to exposure, this is not a case, like *Moore*, where lead exposure, like the faulty ladder, was confined to unused area "not a part of the active work zone at the time * * *." *Moore*, 257 Or App at 569. Here, it is undisputed that A & B employees were exposed to lead as part of their job duties. The fact that the amount of lead ultimately was determined to be below the level at which additional regulatory actions are triggered does not render that exposure a nullity.

In short, 29 CFR section 1910.1025 applies to workplaces where lead exposure is present in any quantity. The regulatory framework is built around quantifiable testing and sampling. The determination required under 29 CFR section 1910.1025(d)(2) is the foundation upon which the remainder of the regulation is built. That later quantifiable air sampling ultimately established the current lead levels to be under the action level does not render the failure to perform the mandatory initial determination noncitable. Accordingly, the ALJ erred in dismissing the citation.

Reversed on petition; affirmed on cross-petition.

---

reasoning as the Second Circuit. *See, e.g.*, *Secretary of Labor v. Southern Scrap Materials Co., Inc.*, 23 OSH Cas (BNA) 15, 2011 WL 4634275 at *23-*24 (OSHRC 2011) (to sustain a citation for violation of the initial determination requirement, Secretary of Labor was not required to prove that employee's exposure to lead was at the action level or higher); *Secretary of Labor v. Gipson-Ricketts, LLC*, 24 OSH Cas (BNA) 1757, 2013 WL 3271353 at *11-*12) (OSHRC 2013) (employer "had an obligation to make an initial determination as to the lead respirator and hazards to which its employees were potentially exposed").